**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LILIAN S. ILETO, an individual and mother to Joseph S. Ileto, deceased; JOSHUA STEPAKOFF, a minor, by his parents Loren Lieb and Alan B. Stepakoff; MINDY GALE FINKELSTEIN, a minor, by her parents David and Donna Finkelstein; BENJAMIN KADISH, a minor, by his parents Eleanor and Charles Kadish; and NATHAN LAWRENCE POWERS, a minor, by his parents Gail and John Michael Powers, for himself and on behalf of a class of persons similarly situated,

   *Plaintiffs-Appellants,*

  v.

GLOCK, INC., a Georgia corporation; RSR MANAGEMENT CORPORATION; and RSR WHOLESALE GUNS SEATTLE INC.,

   *Defendants-Appellees,*

No. 06-56872

D.C. No.
CV-01-09762-ABC

MAADI, an Egyptian business
entity; QUALITY PARTS CO.,
formerly doing business as
Bushmaster Firearms, a Maine
corporation; IMBEL, a Brazilian
business entity; THE LOANDER
PAWNSHOP TOO, a Washington
corporation; DAVID MCGEE, an
individual; INTRAC ARMS
INTERNATIONAL, INC., a Tennessee
Corporation, formerly doing
business as Intrac corporation also
known as Doe 1, and CHINA
NORTH INDUSTRIES CORP., aka
Norinco,

                      *Defendants,*

          and

UNITED STATES OF AMERICA,

    *Defendant-Intervenor-Appellee.*

LILIAN S. ILETO, an individual and
mother to Joseph S. Ileto,
deceased; JOSHUA STEPAKOFF, a
minor, by his parents Loren Lieb
and Alan B. Stepakoff; MINDY
GALE FINKELSTEIN, a minor, by her
parents David and Donna
Finkelstein; BENJAMIN KADISH, a
minor, by his parents Eleanor and
Charles Kadish; and NATHAN
LAWRENCE POWERS, a minor, by his
parents Gail and John Michael
Powers, for himself and on behalf
of a class of persons similarly
situated,
               *Plaintiffs-Appellants,*

                    v.

CHINA NORTH INDUSTRIES CORP.,
aka Norinco,
               *Defendant-Appellee,*

No. 07-15403
D.C. No.
CV-01-09762-ABC

and

UNITED STATES OF AMERICA,
        *Defendant-Intervenor-Appellee,*

and

RSR MANAGEMENT CORPORATION;
RSR GROUP NEVADA, INC.,
formerly doing business as RSR
Wholesale Guns Seattle Inc.;
MAADI, an Egyptian business
entity; QUALITY PARTS CO.,
formerly doing business as
Bushmaster Firearms, a Maine
corporation; IMBEL, a Brazilian
business entity; THE LOANDER
PAWNSHOP TOO, a Washington
corporation; DAVID MCGEE, an
individual; INTRAC ARMS
INTERNATIONAL, INC., a Tennessee
Corporation, formerly doing
business as Intrac Corporation also
known as Doe 1; GLOCK, INC., a
Georgia corporation,
                        *Defendants.*

LILIAN S. ILETO, an individual and
mother to Joseph S. Ileto,
deceased; JOSHUA STEPAKOFF, a
minor, by his parents Loren Lieb
and Alan B. Stepakoff; MINDY
GALE FINKELSTEIN, a minor, by her
parents David and Donna
Finkelstein; BENJAMIN KADISH, a
minor, by his parents Eleanor and
Charles Kadish; and NATHAN
LAWRENCE POWERS, a minor, by his
parents Gail and John Michael
Powers, for himself and on behalf
of a class of persons similarly
situated,

         *Plaintiffs-Appellees,*

         v.

CHINA NORTH INDUSTRIES CORP.,
aka Norinco,

         *Defendant-Appellant,*

         and

No. 07-15404

D.C. No.
CV-01-09762-ABC

OPINION

RSR MANAGEMENT CORPORATION;
RSR GROUP NEVADA, INC.,
formerly doing business as RSR
Wholesale Guns Seattle Inc.;
MAADI, an Egyptian business
entity; QUALITY PARTS CO.,
formerly doing business as
Bushmaster Firearms, a Maine
corporation; IMBEL, a Brazilian
business entity; THE LOANDER
PAWNSHOP TOO, a Washington
corporation; DAVID McGEE, an
individual; INTRAC ARMS
INTERNATIONAL, INC., a Tennessee
Corporation, formerly doing
business as Intrac Corporation also
known as Doe 1; GLOCK, INC., a
Georgia corporation,
                              *Defendants.*

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
August 5, 2008—Pasadena, California

Filed May 11, 2009

Before: Stephen Reinhardt, Susan P. Graber, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Graber;
Partial Concurrence and Partial Dissent by Judge Berzon

# COUNSEL

Peter Nordberg, Berger & Montague, P.C., Philadelphia, Pennsylvania; and Sayre Weaver, The Educational Fund to Stop Gun Violence, La Habra, California, for the plaintiffs-appellants.

Charles H. Dick, Jr., and Shannon D. Sweeney, Baker & McKenzie LLP, for defendant-appellant/appellee China North.

Christopher Renzulli, Renzulli Law Firm, LLP, White Plains, New York, for defendants-appellees Glock & RSR.

H. Thomas Byron, III, Appellate Staff Civil Division, Department of Justice, Washington, D.C., for the defendant-intervenor-appellee.

Beth S. Brinkman, Morrison & Foerster LLP, Washington, D.C., for amicus curiae.

## OPINION

GRABER, Circuit Judge:

By enacting the Protection of Lawful Commerce in Arms Act ("PLCAA" or "Act"), 15 U.S.C. §§ 7901-7903, Pub. L. No. 109-92, 119 Stat. 2095 (2005), Congress has protected federally licensed manufacturers and sellers of firearms from most civil liability for injuries independently and intentionally inflicted by criminals who use their non-defective products. Under the terms of the PLCAA, the claims brought here, by the victims of a criminal who shot them, against a federally licensed manufacturer and a federally licensed seller of firearms must be dismissed. But the claims brought against an unlicensed foreign manufacturer of firearms may proceed. We therefore affirm.

### FACTUAL AND PROCEDURAL HISTORY

On August 10, 1999, Bufford Furrow shot and injured three young children, one teenager, and one adult at a Jewish Community Center summer camp in Granada Hills, California. Later that day, he shot and killed Joseph Ileto, a postal worker. Furrow was carrying at least seven firearms, which he possessed illegally.

In 2001, the shooting victims and Ileto's surviving wife filed this action against the manufacturers, marketers, importers, distributers, and sellers of the firearms. They alleged that Defendants intentionally produce, market, distribute, and sell more firearms than the legitimate market demands in order to take advantage of re-sales to distributors that they know or should know will, in turn, sell to illegal buyers. They also

alleged that Defendants' deliberate and reckless marketing and distribution strategies create an undue risk that their firearms would be obtained by illegal purchasers for criminal purposes.[1] They did not, however, allege that Defendants violated any statute prohibiting manufacturers or sellers from aiding, abetting, or conspiring with another person to sell or otherwise dispose of firearms to illegal buyers. Instead, Plaintiffs brought their claims against Defendants solely under California common law tort statutes for foreseeably and proximately causing injury, emotional distress, and death through knowing, intentional, reckless, and negligent conduct.

In 2002, the district court dismissed the case for failure to state a claim under California law. *Ileto v. Glock, Inc.*, 194 F. Supp. 2d 1040 (C.D. Cal. 2002). We affirmed in part and reversed in part. *Ileto v. Glock, Inc.*, 349 F.3d 1191 (9th Cir. 2003) ("*Ileto I*"). We held that Plaintiffs stated cognizable negligence and public nuisance claims under California law with respect to the firearms actually used in the shootings. *Id.* at 1203-15. We therefore reversed the dismissal of the action against Defendants RSR Management Corp. and RSR Wholesale Guns Seattle Inc. (collectively "RSR"), Glock Inc., and China North Industries Corp. ("China North"), because Plaintiffs alleged that Furrow may have used the firearms manufactured and distributed by those Defendants. *Id.* at 1215-16. We affirmed the dismissal of the action against all other Defendants, however, because the allegations did not support a conclusion that Furrow fired the firearms associated with those Defendants. *Id.* at 1216.

That holding resulted in disagreement within our court. The majority of our colleagues declined, however, to take the case en banc. *Ileto v. Glock Inc.*, 370 F.3d 860 (9th Cir. 2004)

---

[1]Although Plaintiffs alleged knowing conduct by Defendants, the underlying factual basis for the claims is, of course, Furrow's criminal acts. Had the tragic shootings not occurred, there would be neither damages, nor cognizable claims, nor standing by Plaintiffs to bring these claims.

(order denying rehearing). As noted in our opinion our holding was not an outlier: Other jurisdictions had upheld similar claims against manufacturers and distributors of firearms under other state laws. *Ileto I*, 349 F.3d at 1200 n.10, 1206-07, 1214 & n.30 (citing *Hamilton v. Beretta U.S.A. Corp.*, 750 N.E.2d 1055, 1061 (N.Y. 2001); *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002); *City of Chicago v. Beretta U.S.A. Corp.*, 785 N.E.2d 16, 24 (Ill. Ct. App. 2002), *rev'd*, 821 N.E.2d 1099 (Ill. 2004)).

The dispute soon reached the floor of the United States Congress and, in 2005, Congress enacted the PLCAA. The PLCAA generally preempts claims against manufacturers and sellers of firearms and ammunition resulting from the criminal use of those products. The PLCAA affects future and pending lawsuits, and courts are required to "immediately dismiss[ ]" any pending lawsuits preempted by the PLCAA. 15 U.S.C. § 7902(b).

After enactment of the PLCAA, the district court halted discovery and sought briefing on the effect of the Act on this case. Plaintiffs argued that the PLCAA did not apply here and, in the alternative, that the PLCAA is unconstitutional. The district court permitted the United States to intervene, pursuant to 28 U.S.C. § 2403(a), to defend the constitutionality of the Act.

In a published opinion, the district court dismissed Plaintiffs' claims against Defendants Glock and RSR. *Ileto v. Glock, Inc.*, 421 F. Supp. 2d 1274 (C.D. Cal. 2006). The court held that the PLCAA preempted Plaintiffs' claims against those Defendants, *id.* at 1284-98, and upheld the constitutionality of the Act, *id.* at 1298-1304. The court eventually entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b) as to Defendants Glock and RSR. Plaintiffs timely appealed.

In an unpublished order, the district court denied Defendant China North's motion for summary judgment. The court held

that the PLCAA did not preempt Plaintiffs' claims against China North because, by contrast to Glock and RSR, China North is not a federal firearms licensee, as required by the PLCAA. The district court then certified an interlocutory appeal of that order.

We consolidated the appeals. In addition to the parties, the United States appears before us as an intervenor in support of the constitutionality of the PLCAA, and we accepted an amicus curiae brief from the Legal Community Against Violence in support of Plaintiffs.

## STANDARD OF REVIEW

All the questions presented here are questions of law that we review de novo. *See United States v. Lujan*, 504 F.3d 1003, 1006 (9th Cir. 2007) ("[T]he constitutionality of a federal statute [is] a question of law that we review de novo."); *J.&G. Sales Ltd. v. Truscott*, 473 F.3d 1043, 1047 (9th Cir.) ("We apply a de novo standard of review to . . . questions of statutory interpretation."), *cert. denied*, 128 S. Ct. 208 (2007); *Fajardo v. County of Los Angeles*, 179 F.3d 698, 699 (9th Cir. 1999) ("This court reviews de novo Rule 12(c) judgments on the pleadings.").

## DISCUSSION

A. *Preemption of Claims Against Defendants Glock and RSR*

**[1]** The PLCAA requires that federal courts "immediately dismiss[ ]" a "qualified civil liability action." 15 U.S.C. § 7902(b).

> The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade

association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include [specified enumerated exceptions.]

*Id.* § 7903(5)(A). We agree with the parties that this case meets all the elements of that general definition as applied to Defendants Glock and RSR. This case is a "civil action" brought by a "person" for damages and other relief to redress harm "resulting from the criminal . . . misuse of a qualified product by . . . a third party." *Id.* Additionally, Glock and RSR are "manufacturer[s] or seller[s] of a qualified product," *id.*, because they are, respectively, a federally licensed manufacturer and a federally licensed distributor of the firearms allegedly used in the shootings, *see id.* § 7903(2) (defining "manufacturer"); *id.* § 7903(6) (defining "seller").

**[2]** The PLCAA therefore requires dismissal if none of the specified exceptions applies. Plaintiffs argue that the third exception, § 7903(5)(A)(iii), applies. Under that exception, the PLCAA does not preempt

an action in which a manufacturer or seller of a qualified product *knowingly violated a State or Federal statute applicable to the sale or marketing of the product*, and the violation was a proximate cause of the harm for which relief is sought, including—

(I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the

lawfulness of the sale or other disposition of a quali-
fied product; or

(II) any case in which the manufacturer or seller
aided, abetted, or conspired with any other person to
sell or otherwise dispose of a qualified product,
knowing, or having reasonable cause to believe, that
the actual buyer of the qualified product was prohib-
ited from possessing or receiving a firearm or ammu-
nition under subsection (g) or (n) of section 922 of
Title 18[.]

*Id.* § 7903(5)(A)(iii) (emphasis added).

[3] This exception has come to be known as the "predicate
exception," because a plaintiff not only must present a cogni-
zable claim, he or she also must allege a knowing violation of
a "predicate statute." *City of New York v. Beretta U.S.A.
Corp.*, 524 F.3d 384, 390 (2d Cir. 2008), *cert. denied*, 129
S. Ct. 1579 (2009); *District of Columbia v. Beretta U.S.A.
Corp.*, 940 A.2d 163, 168 (D.C. 2008), *cert. denied*, 129
S. Ct. 1579 (2009); *Smith & Wesson Corp. v. City of Gary*,
875 N.E.2d 422, 429-30 (Ind. Ct. App. 2007). That is, a plain-
tiff must allege a knowing violation of "a State or Federal
statute applicable to the sale or marketing of the product." 15
U.S.C. § 7903(5)(A)(iii). In *City of New York*, for instance,
the plaintiffs brought a common-law public nuisance claim
(the cause of action) and also alleged that the defendants
knowingly violated a state criminal statute (the predicate stat-
ute). 524 F.3d at 390.

Here, we previously ruled that Plaintiffs' negligence and
public nuisance allegations state cognizable claims under Cal-
ifornia law.[2] *Ileto I*, 349 F.3d at 1209, 1215. To meet the

_____

[2]We decline to revisit that holding. *See Merritt v. Mackey*, 932 F.2d
1317, 1320 (9th Cir. 1991) ("Under the 'law of the case' doctrine, one
panel of an appellate court will not as a general rule reconsider questions

requirements of the predicate exception, Plaintiffs do not point to an allegation of a knowing violation of any *separate* statute. Instead, Plaintiffs point out that, unlike many jurisdictions, California's general tort law is codified in its civil code. *See* Cal. Civ. Code § 1714(a) (negligence); *id.* § 3479 (nuisance); *id.* § 3480 (public nuisance). Plaintiffs argue that their allegations of knowing violations of those statutes satisfy the requirements of the predicate exception. In short, Plaintiffs argue that California Civil Code sections 1714, 3479, and 3480 ("California tort laws"), provide both the cause of action *and* the requisite predicate statute under the PLCAA. Defendants counter that only a separate statute, regulating firearms exclusively (or at least explicitly), can be a predicate statute.

The parties' disagreement, then, is whether the California tort laws are predicate statutes under the PLCAA. More specifically, the parties dispute whether the California tort statutes are "applicable to the sale or marketing of [firearms[3]]." 15 U.S.C. § 7903(5)(A)(iii). When interpreting a statute, we look first to its text. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case."); *FMC Corp. v. Holliday*, 498 U.S. 52, 57 (1990) ("We begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)). "If the statute's terms are ambiguous, we may use canons of construction, legislative history, and the

---

which another panel has decided on a prior appeal in the same case." (brackets and some internal quotation marks omitted)). Contrary to Defendants' assertion, the intervening case *People v. Arcadia Mach. & Tool, Inc. (In re Firearm Cases)*, 24 Cal. Rptr. 3d 659 (Ct. App. 2005), does not conflict with our previous holding.

[3]The statute covers both firearms and ammunition. Except as otherwise specified, we will refer to "firearms" as a convenient shorthand for "firearms and ammunition."

statute's overall purpose to illuminate Congress's intent." *Jonah R. v. Carmona*, 446 F.3d 1000, 1005 (9th Cir. 2006).

### 1. *Text of the Predicate Exception*

**[4]** "The plainness or ambiguity of statutory [text] is determined by reference to the [text] itself, the specific context in which that [text] is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. Here, the statutory text states that a predicate statute is "a State or Federal statute applicable to the sale or marketing of [firearms]." 15 U.S.C. § 7903(5)(A)(iii). There is no dispute that the California tort laws, which are codified in the California Civil Code, are state statutes. The issue is whether those statutes are "applicable" to the sale or marketing of firearms within the meaning of the PLCAA.

As discussed below, Plaintiffs and Defendants present competing definitions of the term "applicable." Like most terms, "applicable" does not have only one meaning when viewed in isolation. Not surprisingly then, courts have struggled to determine the meaning of "applicable" as used in a variety of statutes. *See, e.g.*, *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) (statute governing medical devices); *McGee v. Peake*, 511 F.3d 1352 (Fed. Cir. 2008) (statute governing the United States Court of Appeals for Veterans Claims); *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350 (D.C. Cir. 2006) (statute governing the Federal Motor Carrier Safety Administration).

One everyday meaning, and a dictionary definition, of the term "applicable" is "capable of being applied." *Black's Law Dictionary* 98 (6th ed. 1990). Plaintiffs urge us to conclude that this expansive definition is the only possible meaning of the term "applicable" in the PLCAA's predicate exception. Under that definition, Plaintiffs would prevail: Because we held in *Ileto I* that Plaintiffs' claims concerning the sale and marketing of firearms are cognizable, the California tort laws

are "[capable of being applied to] the sale or marketing of [firearms]."

By contrast, Defendants argue that Congress intended a very narrow use of the term "applicable," which can mean "relevant" or "applicable specifically." Defendants argue that, under that narrow meaning of the term, the requirements of the predicate exception would be met only if a plaintiff alleged a knowing violation of a statute that pertained *exclusively* to the sale or marketing of firearms. The dictionary captures this narrower definition, *see Black's Law Dictionary* at 98 (defining "applicable" as "relevant"), and so does everyday usage.[4]

**[5]** We are convinced at the outset, then, that the term "applicable" has a spectrum of meanings, including the two poles identified by the parties. To determine Congress' intended meaning in the PLCAA, we must examine "the specific context in which [the term 'applicable'] is used[ ] and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341.

Congress listed examples of predicate statutes in the PLCAA:

> (I) any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or writ-

---

[4]For instance, if someone says, "the following rules are applicable to the game of basketball," one would expect to hear a list of rules concerning traveling, foul shots, and the like. One would *not* expect to hear that force equals mass times acceleration or that an object falls at an increasing rate of 9.8 meters per second per second. The rules of physics undeniably apply to the game of basketball in the broad sense of the term "applicable," but a speaker who listed those rules would almost certainly be doing so for comic effect.

ten statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

(II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of Title 18[.]

15 U.S.C. § 7903(5)(A)(iii). We conclude from those illustrations that Plaintiffs' asserted meaning of "applicable" appears too broad, but that Defendants' proposed restrictive meaning appears too narrow. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961) (noting that "a word is known by the company it keeps"); *Cal. State Legislative Bd. v. Dep't of Transp.*, 400 F.3d 760, 763 (9th Cir. 2005) ("[T]he general term should be defined in light of the specific examples provided.").

The illustrative predicate statutes pertain specifically to sales and manufacturing activities, and most also target the firearms industry specifically. Those examples suggest that Plaintiffs' proposed all-encompassing meaning of the term "applicable" is incorrect, because each of the examples has— at the very least—a direct connection with sales or manufacturing. Indeed, if *any* statute that "could be applied" to the sales and manufacturing of firearms qualified as a predicate statute, there would be no need to list examples at all. Similarly, the examples suggest that Defendants' asserted narrow meaning is incorrect, because some of the examples do not pertain exclusively to the firearms industry.

In conclusion, we hold that, viewed in isolation, the term "applicable" has a range of meanings. The context in which

the term appears in the PLCAA suggests that neither Plaintiffs' nor Defendants' asserted meaning is wholly correct. In any event, we conclude, as did the Second Circuit, *City of New York*, 524 F.3d at 401, that the text of the statute alone is inconclusive as to Congress' intent.[5] We thus are left to examine the additional indicators of congressional intent. *Jonah R.*, 446 F.3d at 1005.

## 2. *The Purpose of the PLCAA*

Congress enacted the PLCAA in response to "[l]awsuits . . . commenced against manufacturers, distributors, dealers, and importers of firearms that operate as designed and intended, which seek money damages and other relief for the harm caused by the misuse of firearms by third parties, including criminals." 15 U.S.C. § 7901(a)(3). Congress found that manufacturers and sellers of firearms "are not, and should not, be liable for the harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended." *Id.* § 7901(a)(5). Congress found egregious "[t]he possibility of imposing liability on an entire industry for harm that is solely caused by others." *Id.* § 7901(a)(6). Congress reasoned that "[t]he liability actions . . . are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law." *Id.* § 7901(a)(7).

---

[5]We acknowledge that the Indiana Court of Appeals reached the opposite conclusion. *City of Gary*, 875 N.E.2d at 434. We find that case to have limited persuasive value, though, in part because the court's decision rested, in the alternative, on the fact that the plaintiffs there had alleged violations of the state's *statutory firearm regulations*. *Id.* at 432-33 & n.7. No such allegations are made here. Indeed, the *City of Gary* court distinguished the facts of this case on that basis. *See id.* at 433 n.7 ("Here, unlike in *Ileto*, the City alleged activity on the part of the Manufacturers that facilitates unlawful sales and violates regulatory statutes.").

**[6]** The PLCAA's stated primary purpose is:

> To prohibit causes of action against manufactur-
> ers, distributors, dealers, and importers of firearms or
> ammunition products, and their trade associations,
> for the harm solely caused by the criminal or unlaw-
> ful misuse of firearm products or ammunition prod-
> ucts by others when the product functioned as
> designed and intended.

*Id.* § 7901(b)(1).

**[7]** In view of those congressional findings and that state-
ment of purpose, Congress clearly intended to preempt
common-law claims, such as general tort theories of liability.[6]
Plaintiffs' claims—"classic negligence and nuisance," *Ileto I*,
349 F.3d at 1202—are general tort theories of liability that
traditionally have been embodied in the common law. With
this background in mind, which strongly suggests that Con-
gress intended to preempt Plaintiffs' claims, we turn to the
predicate exception at issue here.

The predicate exception covers causes of action that allege
knowing violations of a state or federal *statute* applicable to
the sale or marketing of firearms. Plaintiffs argue that this
exception covers *all state statutes* that *could be applied* to the

---

[6]That conclusion is bolstered by Congress' inclusion of the second
exception to preemption: The PLCAA does not preempt claims against a
seller of firearms for negligent entrustment or negligence per se. 15 U.S.C.
§ 7903(5)(A)(ii). That exception demonstrates that Congress consciously
considered how to treat tort claims. While Congress chose generally to
preempt all common-law claims, it carved out an exception for certain
specified common-law claims (negligent entrustment and negligence per
se). *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here . . .
Congress includes particular language in one section of a statute but omits
it in another section of the same Act, it is generally presumed that Con-
gress acts intentionally and purposely in the disparate inclusion or exclu-
sion." (brackets and internal quotation marks omitted)). Plaintiffs have not
argued that their claims fall under this exception.

sale or marketing of firearms. Because California long ago codified its common law into the California Civil Code, Plaintiffs argue that its general tort claims fall within this exception. We disagree for three reasons.

**[8]** First, although the California legislature codified its common law,

> it was not the intention of the Legislature in enacting section 1714 of the Civil Code, as well as other sections of that code declarative of the common law, to insulate the matters therein expressed from further judicial development; rather it was the intention of the Legislature to announce and formulate existing common law principles and definitions for purposes of orderly and concise presentation and with a distinct view toward continuing judicial evolution.

*Li. v. Yellow Cab Co. of Cal.*, 532 P.2d 1226, 1233 (Cal. 1975). In other words, although California has codified its common law, the evolution of those statutes is nevertheless subject to the same "judicial evolution" as ordinary common-law claims in jurisdictions that have not codified common law. That "judicial evolution" was precisely the target of the PLCAA:

> The liability actions . . . are based on theories without foundation in hundreds of years of the common law and jurisprudence of the United States and do not represent a bona fide expansion of the common law. The possible sustaining of these actions by a maverick judicial officer or petit jury would expand civil liability in a manner never contemplated by the framers of the Constitution, by Congress, or by the legislatures of the several States.

15 U.S.C. § 7901(a)(7).

Second, congressional findings speak to the scope of the predicate exception. Against the backdrop of Congress' findings on the unjustified "expansion of the common law," *id.*, Congress also found that "[t]he manufacture, importation, possession, sale, and use of firearms and ammunition in the United States are heavily regulated by Federal, State, and local laws," *id.* § 7901(a)(4). We find it more likely that Congress had in mind only these types of statutes—statutes that regulate manufacturing, importing, selling, marketing, and using firearms or that regulate the firearms industry—rather than general tort theories that happened to have been codified by a given jurisdiction.

Third, Plaintiffs' argument leads to a result that is difficult to square with Congress' intention to create national uniformity. If Plaintiffs' view is correct, then general tort theories of liability *are not* preempted by the PLCAA in those states, like California, that have codified its common law. But, at the same time, those same theories of liability *are* preempted by the PLCAA in the states that have not codified their common law.

**[9]** In conclusion, an examination of the text and purpose of the PLCAA shows that Congress intended to preempt general tort theories of liability even in jurisdictions, like California, that have codified such causes of action.

3. *Legislative History*

**[10]** We make two general observations from our review of the extensive legislative history of the PLCAA.[7] First, all of the congressional speakers' statements concerning the scope of the PLCAA reflected the understanding that manufacturers and sellers of firearms would be liable only for statutory vio-

---

[7]We are indebted to the district court for its exhaustive analysis of the legislative history. *Ileto*, 421 F. Supp. 2d at 1292-96; *see also City of New York*, 524 F.3d at 403-04 (discussing the legislative history of the Act).

lations concerning firearm regulations or sales and marketing regulations. *See, e.g.*, 151 Cong. Rec. S9087-01 (statement of Sen. Craig) ("This bill does not shield [those who] . . . have violated existing law . . . and I am referring to the Federal firearms laws."); *id.* S9217-02 (statement of Sen. Hutchison) ("[Lawsuits] would also be allowed where there is a knowing violation of a firearms law."); *id.* (statement of Sen. Craig reading a *Wall Street Journal* article) ("The gun makers . . . would continue to face civil suits for defective products or for violating sales regulations."); *id.* (statement of Sen. Reed in opposition to the PLCAA) ("We will let [plaintiffs] proceed with their suit if there is a criminal violation or a statutory violation, a violation of regulations, but for the vast number of other responsibilities we owe to each other, that are defined for the civil law, one will not have the opportunity to go to court."); *id.* S8927-01 (statement of Sen. Reed) (stating that the PLCAA would not apply to violations of "statutes related to the sale or manufacturing of a gun"); *id.* S9246-02 (statement of Sen. Santorum) ("This bill provides carefully tailored protections that continue to allow legitimate suits based on knowing violations of Federal or State law related to gun sales.").

**[11]** Second, congressional speakers referred to *this very case* as the type of case they meant the PLCAA to preempt. *See* 151 Cong. Rec. E2162-03 (statement of Rep. Stearns) ("I want the Congressional Record to clearly reflect some specific examples of the type of predatory lawsuits this bill will immediately stop[:] . . . [An] example is the case of *Ileto v. Glock*, in Federal court in Los Angeles, CA."); *id.* (statement of Sen. Craig) ("I want to give some examples of exactly the type of predatory lawsuits this bill will eliminate. . . . [An] example of a lawsuit captured by this bill is the case of *Ileto v. Glock*, pending in Federal court in Los Angeles, CA."); *see also Adames v. Sheahan*, 880 N.E.2d 559, 586 (Ill. Ct. App. 2007) (noting that "Congress was primarily concerned with novel nuisance cases like *Ileto*"), *rev'd on other grounds*, ___

N.E.2d ___, No. 105789, 2009 WL 711297 (Ill. Mar. 19, 2009).

We are mindful of the limited persuasive value of the remarks of an individual legislator. *See, e.g.*, *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980) ("[O]rdinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history."); *Brock v. Writers Guild of Am., W., Inc.*, 762 F.2d 1349, 1356 (9th Cir. 1985) ("The remarks of legislators opposed to legislation are entitled to little weight in the construction of statutes."). Nevertheless, the unanimously expressed understanding of the scope of the PLCAA assists our analysis, particularly when that expressed understanding is in complete harmony with the congressional purpose and the statutory text.

### 4. *Conclusion*

**[12]** "Our inquiry into the scope of a statute's pre-emptive effect is guided by the rule that '[t]he purpose of Congress is the ultimate touchstone in every pre-emption case.' " *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Medtronic, Inc.*, 518 U.S. at 485) (some internal quotation marks omitted). The purpose of the PLCAA leads us to conclude that Congress intended to preempt general tort law claims such as Plaintiffs', even though California has codified those claims in its civil code.[8] Our examination of the legislative history of the Act further confirms that conclusion. Accordingly, we hold that the district court correctly held that

---

[8]The constitutional avoidance doctrine therefore does not apply. *See Boumediene v. Bush*, 128 S. Ct. 2229, 2271 (2008) ("The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation. We cannot ignore the text and purpose of a statute in order to save it." (citation omitted)); *see also supra* Part B.4.

Plaintiffs' California tort claims against Defendants Glock and RSR are preempted by the PLCAA.[9]

B.   *Constitutionality of the PLCAA*

Decrying primarily the retroactive aspects of the Act, Plaintiffs argue that the PLCAA is unconstitutional on its face and as applied. We note at the outset that "retroactive statutes raise particular concerns." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). Indeed,

> [t]he Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.

*Id.*

The strongest protection that federal courts give to those concerns, however, is a requirement that Congress manifest the retroactive nature of legislation with "clear intent." *Id.* at 272. "[A] requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Id.* at 268; *see also id.* at 272-73 ("Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the countervailing benefits."). "Such a requirement allocates to Congress responsibility for fundamental policy judgments concerning the proper temporal reach of statutes, and has the additional virtue of giving legislators a predictable background rule against which to legislate." *Id.* at 273.

---

[9]We need not, and do not, express any view on the scope of the predicate exception with respect to any other statute.

Where, as here, Congress has expressed its clear intent that the legislation be retroactive, "the *constitutional* impediments to retroactive civil legislation are now modest." *Id.* at 272; *see also id.* at 267 ("The Constitution's restrictions, of course, are of limited scope."). "[T]he potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope." *Id.* "Retroactivity provisions often serve entirely benign and legitimate purposes, [including] . . . simply to give comprehensive effect to a new law Congress considers salutary." *Id.* at 267-68.

Additionally, we note that the only function of the PLCAA is to preempt certain claims. The practical effect of the PLCAA is thus to shift the economic burden for those claims from the firearms industry to the would-be plaintiffs. "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality . . ." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). "[T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively . . . ." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984).

With that background understanding, we address each of Plaintiffs' constitutional challenges. Like all appellate courts that have assessed the constitutionality of the PLCAA, *City of New York*, 524 F.3d at 392-98; *Adames*, 2009 WL 711297, at *20-21; *District of Columbia*, 940 A.2d at 172-82, we hold that the Act is constitutional on its face and as applied.

1. *Separation of Powers*

[13] Plaintiffs argue that, on its face, the PLCAA violates the constitutional requirement of separation of powers because, by enacting that Act, Congress impinged on the role of the judiciary. It has long been recognized that Congress may not "prescribe rules of decision to the Judicial Depart-

ment of the government in cases pending before it." *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147 (1872). "Whatever the precise scope of *Klein*, however, later decisions have made clear that its prohibition does not take hold when Congress 'amend[s] applicable law.' " *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218 (1995) (quoting *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992)). "Thus, if a statute 'compel[s] changes in the law, not findings or results under old law,' it merely amends the underlying law, and is therefore not subject to a *Klein* challenge." *Imprisoned Citizens Union v. Ridge*, 169 F.3d 178, 187 (3d Cir. 1999) (alteration in original) (quoting *Robertson*, 503 U.S. at 438).

**[14]** Here, Congress has amended the applicable law; it has not compelled results under old law. The PLCAA sets forth a new legal standard—the definition (with exceptions) of a "qualified civil liability action"—to be applied to all cases. As we explained in *Catholic Social Services, Inc. v. Reno*, 134 F.3d 921, 926 (9th Cir. 1997) (per curiam), the Supreme Court in *Robertson* "held that a statute affecting pending cases, indeed designating them by name and number, did not offend separation of powers because Congress was changing the law applicable to those cases rather than impermissibly interfering with the judicial process." Here, Plaintiffs' argument that the PLCAA runs afoul of *Klein* is even less compelling than the argument in *Robertson* because the PLCAA applies generally to all cases, both pending and future.

We likewise reject Plaintiffs' alternative argument that the PLCAA violates the Supreme Court's holding in *Plaut* that Congress cannot "overrule[ ] 'the judicial department with regard to a particular case or controversy.' " (Quoting *Plaut*, 514 U.S. at 227.) As the quoted sentence makes clear, that rule applies to *final* decisions by the judiciary, not to pending cases. *See id.* ("[E]ach court, at every level, must decide [a case] according to existing laws. *Having achieved finality, however*, a judicial decision becomes the last word of the judicial department with regard to a particular case or contro-

versy [and cannot be overruled by congressional act].” (emphasis added) (citation and internal quotation marks omitted)). The PLCAA applies only to pending and future cases and does not purport to undo final judgments of the judiciary. The mere fact that members of Congress wanted to preempt *this* pending case by name does not change our analysis.

**[15]** For those reasons, we hold that the PLCAA does not violate the constitutional separation of powers. *See also City of New York*, 524 F.3d at 395-96 (holding that the PLCAA does not violate separation of powers doctrine); *District of Columbia*, 940 A.2d at 172-73 (same).

2. *Equal Protection, Substantive Due Process, and Takings*

**[16]** Plaintiffs next argue that the PLCAA violates equal protection and substantive due process principles because the Act is an unconstitutional exercise of congressional power that cannot withstand rational basis review. Plaintiffs face an uphill battle: “[B]arring irrational or arbitrary conduct, Congress can adjust the incidents of our economic lives as it sees fit. Indeed, the Supreme Court has not blanched when settled economic expectations were upset, as long as the legislature was pursuing a rational policy.” *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1086 (9th Cir. 1989) (citations omitted); *see also Pension Benefit*, 467 U.S. at 729 (“Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches[.]”); *Usery*, 428 U.S. at 15 (“It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.”).

There is nothing irrational or arbitrary about Congress' choice here: It saw fit to "adjust the incidents of our economic lives" by preempting certain categories of cases brought against federally licensed manufacturers and sellers of firearms. In particular, Congress found that the targeted lawsuits "constitute[ ] an unreasonable burden on interstate and foreign commerce of the United States," 15 U.S.C. § 7901(a)(6), and sought "[t]o prevent the use of such lawsuits to impose unreasonable burdens on interstate and foreign commerce," *id.* § 7901(b)(4).[10] Congress carefully constrained the Act's reach to the confines of the Commerce Clause. *See, e.g.*, *id.* § 7903(2) (including an interstate- or foreign-commerce element in the definition of a "manufacturer"); *id.* § 7903(4) (same: "qualified product"); *id.* § 7903(6) (same: "seller").

Plaintiffs disagree with Congress' judgment in this regard. In their view, the firearms industry is subject to relatively few lawsuits compared to other major industries and, in any event, the pending lawsuits could not possibly have an appreciable effect on the firearms industry (and, by extension, on interstate or foreign commerce). We need not tarry long on these considerations, because our only task is to consider whether Congress' chosen allocation was "irrational or arbitrary." *Lyons*, 252 F.3d at 1086; *Usery*, 428 U.S. at 15; *see also Pierce County v. Guillen*, 537 U.S. 129, 147 (2003) (upholding a Commerce Clause challenge because "Congress could reasonably believe" that the statute affected interstate commerce). We have no trouble concluding that Congress rationally could find that, by insulating the firearms industry from a specified set of lawsuits, interstate and foreign commerce of firearms would be affected. And "it was eminently rational for

---

[10]We note that Congress also included findings and statements of purpose related to its interest in protecting individuals' Second Amendment right to bear arms. 15 U.S.C. § 7901(a)(1)&(2); *id.* § 7901(b)(2). In their briefs, Plaintiffs argued that the government has no such legitimate interest, but the Supreme Court has since disagreed. *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).

Congress to conclude that the purposes of the [PLCAA] could be more fully effectuated if its . . . provisions were applied retroactively." *Pension Benefit*, 467 U.S. at 730; *see also City of New York*, 524 F.3d at 395 ("We find that Congress has not exceeded its authority in this [PLCAA] case, where there can be no question of the interstate character of the industry in question and where Congress rationally perceived a substantial effect on the industry of the litigation that the Act seeks to curtail."); *District of Columbia*, 940 A.2d at 175 ("Thus the PLCAA . . . is reasonably viewed as an 'adjust[ment of] the burdens and benefits of economic life' by Congress, one it deemed necessary in exercising its power to regulate interstate commerce." (alteration in original) (quoting *Usery*, 428 U.S. at 15)); *Adames*, 2009 WL 711297, at *20-21 (similarly rejecting a Commerce Clause challenge to the PLCAA).

Plaintiffs argue, in the alternative, that both equal protection and substantive due process principles require us to conduct a more searching review. Plaintiffs cite *Lawrence v. Texas*, 539 U.S. 558 (2003), but they fail to identify—and we fail to see—any suspect classification common to those adversely affected by the PLCAA.

Plaintiffs also argue that greater scrutiny is required because they have a vested property right in their accrued state-law causes of action. Plaintiffs' premise is incorrect: "We have squarely held that although a cause of action is a species of property, a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained." *Lyon*, 252 F.3d at 1086 (emphasis and internal quotation marks omitted); *see also Fields v. Legacy Health Sys.*, 413 F.3d 943, 956 (9th Cir. 2005) ("Causes of action are a species of property protected by the Fourteenth Amendment's Due Process Clause. However, a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained." (citation, internal quotation marks, and emphasis omitted)); *Austin v. City of Bisbee*, 855 F.2d 1429, 1435 (9th Cir. 1988) (explaining that, although a cause of

action is a species of property, "it is inchoate and affords no definite or enforceable property right until reduced to final judgment" (internal quotation marks omitted)).

Plaintiffs' argument that the PLCAA effects an unconstitutional taking without just compensation fails for the same reason. *See Landgraf*, 511 U.S. at 266 ("The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of *vested* property rights . . . ." (emphasis added)); *see also Concrete Pipe & Prods. of Cal. Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 641 (1993) ("Given that [the petitioner's] due process arguments are unavailing, it would be surprising indeed to discover [that] the challenged statute nonetheless violat[ed] the Takings Clause."); *District of Columbia*, 940 A.2d at 180-82 (rejecting a Takings Clause challenge to the PLCAA).

### 3. *Procedural Due Process*

Plaintiffs next argue that the PLCAA violates their procedural due process rights because their pending lawsuit was abridged without adequate hearing. "As [the Supreme Court's] decisions have emphasized time and again, the Due Process Clause grants the aggrieved party the opportunity to present his case and have its merits fairly judged." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982).

In *Logan*, state law required a state commission to conduct a fact-finding conference within 120 days of receiving of an employment discrimination complaint. *Id.* at 424. The plaintiff filed a timely complaint, but the commission inadvertently convened the conference *after* the 120-day deadline. *Id.* at 424-25. The Illinois Supreme Court held that the Commission therefore lacked jurisdiction over the complaint because the 120-day deadline was jurisdictional, and rejected the plaintiff's due process arguments. *Id.* at 426-27.

The United States Supreme Court reversed. The Court held that the plaintiff had a protected property interest in her claim and "that '*some* form of hearing' is required before the owner is finally deprived of a protected property interest." *Id.* at 433 (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 n.8 (1972)). "To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement." *Id.* at 434.

But the Court explicitly limited its holding to "a procedural limitation on the claimant's ability to assert his rights, not a substantive element of the [underlying] claim." *Id.* at 433. The Court explained:

> Of course, the State remains free to create substantive defenses or immunities for use in adjudication—or to eliminate its statutorily created causes of action altogether—just as it can amend or terminate its welfare or employment programs. The Court held as much in *Martinez v. California*, 444 U.S. 277 (1980), where it upheld a California statute granting officials immunity from certain types of state tort claims. We acknowledged that the grant of immunity arguably did deprive the plaintiffs of a protected property interest. But they were not thereby deprived of property without due process, just as a welfare recipient is not deprived of due process when the legislature adjusts benefit levels. *In each case, the legislative determination provides all the process that is due*.

*Id.* at 432-33 (some citations omitted) (emphasis added).

**[17]** Here, the PLCAA does not impose a procedural limitation; rather, it creates a substantive rule of law granting immunity to certain parties against certain types of claims. In such a case, "the legislative determination provides all the

process that is due." *Id.* at 433. On the substantive question created by the PLCAA—whether this case meets the definition of a "qualified civil liability action"—Plaintiffs were, of course, afforded an ample hearing before the district court. We therefore hold that the PLCAA did not violate Plaintiffs' procedural due process rights. *See also District of Columbia*, 940 A.2d at 177 ("[W]e hold that while the plaintiffs' cause of action . . . 'is a species of property protected by . . . [d]ue process,' they received 'all the process that is due' when Congress barred pending actions such as theirs from proceeding as a rational means 'to give comprehensive effect to a new law that it considered salutary.' " (quoting *Logan*, 455 U.S. at 428; *Landgraf*, 511 U.S. at 268) (brackets omitted)).

**[18]** In conclusion, like all other appellate courts to have addressed the issue, we hold that the PLCAA is constitutional.

4. *Constitutional Avoidance*

**[19]** We respond briefly to the thoughtful views of our dissenting colleague on the topic of constitutional avoidance. That doctrine does not apply where, as here, congressional intent is clear from the text and purpose of the statute. *See supra* note 8 (quoting *Boumediene*, 128 S. Ct. at 2271). Because the dissent's alternative interpretation of the PLCAA rests entirely on the doctrine, we explain below why the doctrine would not apply, even if congressional intent were not clear from the text and purpose of the statute.

We begin with the scope of the doctrine. In *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, the Supreme Court stated that, "where an otherwise acceptable construction of a statute would raise *serious constitutional problems*, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." 485 U.S. 568, 575 (1988) (emphasis added); *see also Clark v. Martinez*, 543 U.S. 371, 381 (2005) (describing the doctrine as "a tool for

choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises *serious constitutional doubts*" (emphasis added)). As the Court has instructed, we may invoke the doctrine only if we have "grave doubts" about the constitutionality of the statute. *Almendarez-Torres v. United States*, 523 U.S. 224, 237-38 (1998) (quoting *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916)); *see also id.* at 238 ("[T]hose who invoke the doctrine must believe that the alternative is a *serious likelihood* that the statute will be held unconstitutional." (emphasis added)).

We have no grave doubts here. The dissent does not, and cannot, point to a single case in which we, the Supreme Court, or any sister circuit has held that a federal statute violates substantive due process for the reasons asserted by Plaintiffs. And, as discussed above, we have upheld against constitutional challenges many statutes with characteristics nearly identical to those of the PLCAA.

The dissent bypasses those important and indisputable facts in the following way. First, it argues that the Supreme Court has never addressed the *precise* issue at hand: whether Congress may abolish pending common-law claims[11] without providing any alternative means of redress. Second, the dissent argues that the Supreme Court has suggested that this issue would raise serious constitutional questions. We disagree on both counts.

First, the PLCAA does not completely abolish Plaintiffs' ability to seek redress. The PLCAA preempts certain categories of claims that meet specified requirements, but it also carves out several significant exceptions to that general rule. Some claims are preempted, but many are not. Indeed, as we

---

[11]Plaintiffs bring statutory, not common-law claims; as we have recognized above, however, the relevant California statutes essentially codify state common law.

hold below, Plaintiffs may proceed on their claims against Defendant China North. Plaintiffs' ability to seek redress has been limited, but not abolished.[12]

Second, we do not doubt the constitutionality of the PLCAA, let alone have "grave doubts." As discussed above, no decision by us, the Supreme Court, or any sister circuit has held that a statute violates substantive due process for the reasons asserted by Plaintiffs. To the contrary, scores of cases concerning very similar statutes have held that the statutes do not violate substantive due process principles.

The dissent finds, in a small number of sources, hints that there could be a lurking, serious constitutional question. Justice Marshall stated in a concurrence that he would adopt a more searching review, *see PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 93-94 (1980) (Marshall, J., concurring), and Justice White stated in a dissent from dismissal of certiorari that he would prefer to address the issue, *see Fein v. Permanente Med. Group*, 474 U.S. 892, 894-95 (1985) (White, J., dissenting from dismissal of certiorari). Dissent at 5597-98. Those comments do not raise a serious constitutional question. The doctrine of constitutional avoidance requires "grave doubts," not occasional statements by a justice or two.

More importantly, the dissent quotes majority opinions in

---

[12]Furthermore, as the dissent recognizes, dissent at 5619, its proffered interpretation of the PLCAA would raise the same constitutional concern. The dissent would require a plaintiff to allege and prove a "knowing" statutory violation, even though that requirement introduces a new, or more difficult, element for the plaintiff to prove. Dissent at 5620. That interpretation, however, also "abolishes" common-law remedies for a large class of plaintiffs, because certain claims that were cognizable before the enactment of the PLCAA would no longer be cognizable. Whatever the boundaries of the constitutional avoidance doctrine, its point is to adopt an alternative interpretation of the statute that avoids any constitutional problem, whereas the dissent's alternative still raises the identical issue in a slightly different form.

two cases: *N.Y. Cent. R.R. Co. v. White*, 243 U.S. 188, 201 (1917); and *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 88 (1978). Dissent at 5597-98. But those sources do not demonstrate a serious constitutional question either. In *White*, the Court expressed concern about whether "a State might, without violence to the constitutional guaranty of 'due process of law,' suddenly set aside *all common-law rules* respecting liability as between employer and employee, without providing a reasonably just substitute." 243 U.S. at 201 (emphasis added). That dictum is inapposite. The PLCAA contains numerous exceptions and comes nowhere near setting aside all common-law rules concerning firearm manufacturers.

The dissent's reliance on *Duke Power* is even less persuasive. There, the Court reiterated that it was an open question whether a legislature may abolish a common-law recovery scheme without providing a reasonable substitute remedy. *Duke Power*, 438 U.S. at 88. As we have repeatedly noted, here Congress has left in place a number of substitute remedies.

For these reasons, we decline to apply the doctrine of constitutional avoidance.

## C.   *Preemption of Claims Against Defendant China North*

Finally, we address Defendant China North's interlocutory appeal from the district court's order holding that the PLCAA does not preempt Plaintiffs' claims against it. We return to the text of the PLCAA, which preempts

> a civil action or proceeding or an administrative proceeding brought by any person *against a manufacturer or seller of a qualified product*, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the

criminal or unlawful misuse of a qualified product by the person or a third party, but shall not include [specified enumerated exceptions.]

15 U.S.C. § 7903(5)(A) (emphasis added). Again, we agree with the parties that this case is a "civil action" brought by a "person" for damages and other relief to redress harm, "resulting from the criminal . . . misuse of a qualified product by . . . a third party." *Id.* The parties dispute, however, whether the case is "brought . . . against a manufacturer or seller of a qualified product." *Id.*

[20] In *Ileto I*, 349 F.3d at 1215, we held that Plaintiffs' claims against Defendant China North stated a claim under California law because of China North's status as a manufacturer and seller of firearms. The PLCAA preempts only actions brought against *federally licensed* manufacturers and sellers of firearms. *See id.* § 7903(2) (defining the term "manufacturer"); *id.* § 7903(6) (defining the term "seller").[13] China

---

[13]The full text of those provisions states:

The term "manufacturer" means, with respect to a qualified product, a person who is engaged in the business of manufacturing the product in interstate or foreign commerce and who is licensed to engage in business as such a manufacturer under [federal law].

15 U.S.C. § 7903(2).

The term "seller" means, with respect to a qualified product—

(A) an importer (as defined in section 921(a)(9) of Title 18) who is engaged in the business as such an importer in interstate or foreign commerce and who is licensed to engage in business as such an importer under [federal law];

(B) a dealer (as defined in section 921(a)(11) of Title 18) who is engaged in the business as such a dealer in interstate or foreign commerce and who is licensed to engage in business as such a dealer under [federal law]; or

(C) a person engaged in the business of selling ammunition (as defined in section 921(a)(17)(A) of Title 18) in interstate or foreign commerce at the wholesale or retail level.

*Id.* § 7903(6).

North concedes that it is not a federally licensed manufacturer or seller of firearms. It follows, then, that the PLCAA does not preempt Plaintiffs' claims against China North.

To escape this straightforward reasoning, China North points out that the PLCAA preempts more than actions brought against federally licensed manufacturers and sellers of firearms. The PLCAA also preempts actions brought against *all* sellers of ammunition. *Id.* § 7903(6)(C). China North argues that, because it is a seller of ammunition, the PLCAA preempts Plaintiffs' claims, notwithstanding the fact that Plaintiffs' claims concern only China North's actions as a manufacturer and seller of firearms and have nothing to do with China North's coincidental status as a seller of ammunition. We are unpersuaded.

The PLCAA preempts specified types of liability actions; it does not provide a blanket protection to specified types of defendants. *See id.* § 7902(a) ("A qualified civil liability action may not be brought in any Federal or State court."). Furthermore, Congress chose to preempt certain actions brought against manufacturers and sellers of firearms, but explicitly limited the preemptive effect to those manufacturers and sellers who are *federally licensed*. China North's reading of the statute would eviscerate that limitation when, as here, the defendant also happens to be a seller of ammunition.

China North argues that, had Congress intended a nexus between the basis of the allegations and the nature of the defendant's business, it would have modified the term "qualified product" with the definite article "the," instead of the indefinite article "a." The scope of preempted actions thereby would encompass

> a civil action or proceeding or an administrative pro-
> ceeding brought by any person against a manufac-
> turer or seller of a qualified product, or a trade
> association, for damages, punitive damages, injunc-

tive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of **[the]** qualified product by the person or a third party.

15 U.S.C. § 7903(5)(A). We grant that China North's alteration arguably is more clear but, without more, we are not persuaded on that basis alone that Congress intended to undo the logical reading of the statute as requiring a nexus between the basis of the allegations and the nature of the defendant's business. Plaintiffs' claims concern the manufacture and sale of firearms; we cannot conclude that those claims are preempted simply because China North also happens to sell ammunition.

**[21]** We therefore affirm the district court's holding that the PLCAA does not preempt Plaintiffs' claims against China North, and we remand for further proceedings.

## CONCLUSION

We sympathize with Plaintiffs, who suffered grievous harm, that Congress preempted some of their claims. Nevertheless, the Constitution "allocates to Congress responsibility for [such] fundamental policy judgments." *Landgraf*, 511 U.S. at 273. Finding no constitutional flaw, we affirm the district court's holding that the PLCAA applies to Plaintiffs' claims against Defendants Glock and RSR. We also affirm the district court's holding that the PLCAA does not apply to Plaintiffs' claims against Defendant China North because, lacking a federal firearms license, it cannot seek haven under the PLCAA.

**No. 06-56872: AFFIRMED.** Costs on appeal awarded to Defendants-Appellees Glock and RSR.

**Nos. 07-15403 & 07-15404: AFFIRMED and REMANDED for further proceedings.** Costs on appeal awarded to Plaintiffs-Appellants.

**Volume 2 of 2**

BERZON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the language of the PLCAA's predicate exception is ambiguous. The interpretation on which the majority ultimately settles, however, requires deciding what I consider to be a substantial constitutional question: whether, if the PLCAA requires the dismissal of Plaintiffs' pending state causes of action, the statute will unconstitutionally deprive them of a protected property interest.

The majority resolves this question by concluding that the PLCAA's mandatory dismissal provision is rationally related to a legitimate government interest and that no heightened level of constitutional scrutiny is warranted. The majority's cursory discussion of the constitutional issue belies the sweeping nature of what it reads the PLCAA to do, and the difficult questions of constitutional law required to uphold that reading. Neither the Supreme Court nor this Circuit has ever made clear that rational basis review is the proper standard on which to review a federal statute that retroactively requires the dismissal of pending causes of action for injuries cognizable at common law but does not leave any alternative means of redress. Moreover, even if we were to assume that no heightened level of scrutiny is appropriate, I am not convinced that such a statute would survive the rational basis review outlined by the Supreme Court in *Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59 (1978).

The majority tacitly breaks new ground in deciding these questions. It need not — and should not — do so. The canon of constitutional avoidance counsels that we should "construe the statute to avoid [serious constitutional questions] unless such a construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1983); *see also Clark v. Martinez*, 543 U.S. 371, 380-81 (2005); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979). In

accordance with that maxim, I would adopt a different, but in my view equally supportable, reading of the ambiguous statutory language, which would permit the Plaintiffs' suit as against Defendants Glock and RSR ("Defendants") to go forward. I therefore respectfully dissent from the majority's discussion of Plaintiffs' substantive due process challenge, as I would not decide the question, and from its holding that their lawsuit does not come within the PLCAA's predicate exception.

## I.

### A.

Plaintiffs have raised a number of constitutional challenges. The one that concerns me here is their substantive due process argument. Before I explain why their challenge presents a serious constitutional question, I think it useful, as a preliminary matter, to identify the property interest on which Plaintiffs contend the PLCAA intrudes. *See Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994).

Generally speaking, if a plaintiff alleges that a fundamental right is burdened by a state action, the state action is subject to strict scrutiny and cannot stand unless it is "narrowly tailored to serve a compelling state interest." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (internal quotation marks omitted). If a lesser liberty or property interest is at stake, the state action is subject to rational basis review, which requires "a reasonable relation to a legitimate state interest." *Id.* at 722. Various forms of intermediate scrutiny, in between these two poles, have sometimes been found applicable. *See Hutchins v. District of Columbia*, 188 F.3d 531, 563 & n.24 (D.C. Cir. 1999) (Rogers, J., concurring in part) (collecting cases).

Plaintiffs here have asserted a property interest in maintaining their pending state-law causes of action. They acknowl-

edge that the monetary award those causes of action might ultimately yield if they proceeded to a final judgment is uncertain, so they currently have no enforceable right to any particular amount of damages. But, they assert, the PLCAA also trenches on a separate and independently valuable interest: their interest in maintaining their causes of action prior to judgment and not having them dismissed.

The majority implicitly agrees with Plaintiffs' position that this interest is cognizable and protected by the Due Process Clause. This much is clear, because the majority applies rational basis review. If Plaintiffs' interest were wholly unprotected, no scrutiny, rational basis or otherwise, would be required.

I pause to emphasize this point, because the majority then goes on to make a potentially misleading statement: that Plaintiffs have no "vested property right in their accrued state-law causes of action." Maj. Op. at 5574. What the majority appears to mean is that Plaintiffs have not stated a fundamental property interest deserving of heightened scrutiny. I do not understand the majority to mean that Plaintiffs have no property interest in their causes of action at all. If that were what the majority meant, it would be quite wrong. Like stocks or business operating licenses, the probable value of a plaintiff's cause of action may fluctuate over time — here, between filing and the entry of judgment — but such fluctuations do not mean that the cause of action is without value.[1] Plaintiffs have expended time and money to maintain their lawsuit, and, if

---

[1] Stock ownership creates a property interest, even though the value of stock is uncertain until the moment it is sold. *See Western Pac. R.R. Corp. v. Western Pac. R.R. Co.*, 197 F.2d 994, 1008 (9th Cir. 1952), *rev'd on other grounds*, 345 U.S. 247 (1953). Similarly, a state operating license (such as a liquor license) that has been granted and can be revoked only "for cause" creates a cognizable property interest, even though the ultimate worth of that license, in terms of how much of a profit the licensee will earn in a year by operating under it, is uncertain. *See Barry v. Barchi*, 443 U.S. 55, 64 (1979). And pending causes of action qualify as "property of the estate" in bankruptcy under 11 U.S.C. § 541(a)(1) — including causes of action sounding in tort, such as personal injury, for which the ultimate amount of recovery is uncertain. *See, e.g., In re Arnold*, 252 B.R. 778 (9th Cir. BAP 2000); *Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 707-09 (9th Cir. 1986).

they were so inclined, they could have "sold" their causes of action to defendants by settling for a sum of money reflecting the expected recovery at that point in the litigation.[2] A pending cause of action, therefore, may be more or less valuable at various points during its pendency, but, even before it is reduced to a final dollar amount, it is a "species of property protected by the . . . Due Process Clause," as the Supreme Court held in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) (citations omitted).

I therefore read the majority's statement that Plaintiffs lack a "vested property right in their accrued state-law causes of action," Maj. Op. at 5574, to indicate the majority's view that although there is a protected property interest at stake, it is not a fundamental right, so rational basis review, rather than strict scrutiny, is sufficient. This usage, though odd, appears to be consistent with our case law. *Lyon v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001), for example, stated that "a party's property right in any cause of action does not vest until a final unreviewable judgment is obtained," *id.* at 1086 (internal quotation marks and emphasis omitted), but it also assumed that a statute depriving the party of the ability to litigate that cause of action must nevertheless withstand rational basis review. *See id.* ("Of course, the legislature must act in a rational manner; that almost goes without saying. Here the choice was assuredly rational.") (internal citations omitted). *Accord Duke Power*, 438 U.S. at 88 n.32 (stating that "[a] person has no property, no vested interest, in any rule of the common law," but applying rational basis review to federal statute precluding

---

[2]Additionally, California law designates certain civil actions as "choses in action," which may be assigned to third parties while they are still pending. *See* Cal. Civ. Code Sec. 954 (tort actions for damage to personal property are assignable). Although apparently not applicable to Plaintiffs' causes of action in this case, *see Pony v. County of Los Angeles*, 433 F.3d 1138, 1143 (9th Cir. 2006) (tort actions for personal injury are typically not assignable under California law), the "chose in action" concept further underscores the fact that pending causes of action generally have value prior to judgment.

suit) (internal quotation marks and citation omitted); *Fields v. Legacy Health Sys.*, 413 F.3d 943, 955-56 (9th Cir. 2005) (upholding statute against substantive due process challenge on rational basis review; recognizing a distinction between vested and non-vested property rights only in the context of petitioner's procedural due process claim).[3]

## B.

If this case were directly controlled by the case law just cited, I would agree that rational basis review is the proper level of scrutiny to apply here. And if the PLCAA were indistinguishable from the statutes at issue in *Lyon*, *Duke Power*, *Fields* and *Austin*, I would be constrained to hold that the

---

[3]The majority also cites *Austin v. City of Bisbee*, 855 F.2d 1429 (9th Cir. 1988), as supporting its constitutional holding. *Austin* is confusing. It states first that "[a] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause," *id.* at 1435 (internal quotation marks omitted), then that a pending cause of action is "inchoate and affords no definite or enforceable property right until reduced to final judgment," *id.* at 1436 (citation omitted), and finally that "[e]ven if Austin had a cognizable property right to overtime compensation, his claim fails on due process grounds." *Id.* If the middle one of these statements is read as indicating that even rational basis scrutiny is inapplicable, it would be clearly at odds with *Duke Power*, which identifies rational basis as the appropriate level of review for such a deprivation. It would also be inconsistent with the very case *Austin* cites as support: *In re Consolidated U.S. Atmospheric Testing Litigation*, 820 F.2d 982, 988-89 (9th Cir. 1987), which adopted the First Circuit's analysis in *Hammond v. United States*, 786 F.2d 8 (1st Cir. 1986). Both *Atmospheric Testing* and *Hammond*, despite their observation that one has no "vested" interest in a pending cause of action, apply rational basis review to the deprivation of that interest. *See Atmospheric Testing*, 820 F.2d at 990; *Hammond*, 786 F.2d at 12-13. (The First Circuit recently clarified that *Hammond* does not stand for the proposition that a litigant has *no* protected interest in a cause of action prior to the entry of judgment; if it did, it would be "squarely in tension with the Supreme Court's recognition in *Logan* that a cause of action is a protected property interest." *See Dr. Jose S. Belaval, Inc. v. Perez-Perdomo*, 465 F.3d 33, 37 n.4 (1st Cir. 2006).) I therefore do not read the opaque line in *Austin* as anything other than a factual statement about the nature of a pending cause of action.

PLCAA's intrusion on Plaintiffs' interest survives rational basis review.

But the PLCAA is unlike those other statutes in critical respects. We have never upheld against substantive due process attack a federal statute with precisely the PLCAA's constellation of characteristics: (1) It completely extinguishes an individual litigant's ability to litigate a cause of action, rather than limiting the amount of recovery or the procedure for bringing suit, and it leaves no alternative channel by which the individual may address his injury; and (2) the individual's cause of action is for an injury that would be cognizable under state common law, and it was filed and pending at the time of the federal statute's enactment.[4] To hold such a statute con-

---

[4]All the cases on which the majority relies are distinguishable on one or more of these grounds.

*Lyon* involved a challenge to the General Aviation Revitalization Act's statute of repose, which barred any "civil action" against a manufacturer if the accident occurred more than eighteen years after the aircraft was delivered to the purchaser. *See* 252 F.3d at 1081. The statute did not completely extinguish litigants' rights to sue in tort, but only limited the window in which such causes of action could be filed. The *Lyon* plaintiffs had not yet filed an action at the time of the statute's passage. *See id.*

*Austin* involved a challenge to an amendment of the Fair Labor Standards Act that barred recovery of unpaid overtime wages accrued prior to 1986. *See* 855 F.2d at 1431. The amendment did not abrogate state tort law; rather, it curtailed a statutorily-created cause of action. *See id.* at 1436 ("Property rights to public benefits are defined by the statutes or customs that create the benefits. When, as here, the statute authorizing the benefits is amended or repealed, the property right disappears.") (internal quotation marks omitted).

*Fields* involved a challenge to Oregon's statute of limitations for wrongful death suits and its statute of repose for medical malpractice suits. The state provisions did not extinguish individuals' ability to sue entirely, but only narrowed the temporal window in which suits could be filed. *See* 413 F.3d at 956-57. Moreover, *Fields* noted that the plaintiffs' "right of action for wrongful death is purely statutory and . . . in Oregon there was no right of action for wrongful death at common law." *Id.* at 959. In addition, Oregon's statutes of limitation and repose were enacted long before

stitutional on rational basis review, despite the absence of any provision for alternative forms of redress, is to step onto new and uncertain constitutional territory.

In general, the majority is correct that Congress may limit or abrogate rights recognized at common law when enacting legislation "adjusting the burdens and benefits of economic life," so long as the abrogation is rationally related to a permissible goal. *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). It is not clear from past case law, however, whether rational basis review is the appropriate level of scrutiny for a statute that abrogates common-law remedies *without providing or leaving open a substitute remedial scheme*.

In fact, the Supreme Court as a whole and individual Justices of the Court have repeatedly recognized that "[q]uite serious constitutional questions might be raised if a legislature attempted to abolish certain categories of common-law rights in some general way." *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 93-94 (1980) (Marshall, J, concurring). *See also New York Central R.R. Co. v. White*, 243 U.S. 188, 201 (1917) (expressing uncertainty as to whether "a state might, without violence to the constitutional guaranty of 'due process

---

Fields filed his suit. *See id.* at 949; *see also* Or. Rev. Stat. §§ 30.020(1) (statute of limitations), 12.110(4) (statute of repose).

*Duke Power* involved a challenge to the Price-Anderson Act, which limited federally licensed nuclear facilities' accident liability to $560 million. *See* 438 U.S. at 66-67. The Act did not abrogate state tort remedies, but only imposed a federal limit on the maximum amount of recovery plaintiffs could obtain. The Act also provided for cost-sharing among nuclear operators and the mandatory waiver of defenses in case of an accident, *id.* which the Court held was a "reasonably just substitute for the [status quo at] common-law[.]" *Id.* at 88. The plaintiffs, who lived close to planned nuclear facilities, had not filed any cause of action at the time of the Price-Anderson Act's passage; rather, they sought a declaratory judgment that the Act was unconstitutional, premised on the prospective due process violation they would suffer should a nuclear accident occur. *Id.* at 67-70.

of law,' suddenly set aside all common-law rules respecting liability as between employer and employee, without providing a reasonably just substitute"). To date, the Supreme Court has never decided what level of constitutional scrutiny applies to a statute that abrogates a common-law cause of action and leaves no alternative remedy available. Dissenting from the dismissal of certiorari in a case that would have presented this question squarely, Justice White noted:

> Whether due process requires a legislatively enacted compensation scheme to be a quid pro quo for the common-law or state-law remedy it replaces, and if so, how adequate it must be, . . . appears to be an issue unresolved by this Court, and one which is dividing the appellate and highest courts of several States.

*Fein v. Permanente Med. Group*, 474 U.S. 892, 894-95 (1985) (White, J., dissenting from dismissal of certiorari). This same question was expressly left unresolved in *Duke Power*, which declined to decide what constitutional test would apply to a statute that left no alternative remedies available:

> Initially, it is not at all clear that the Due Process Clause in fact requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy. However, we need not resolve this question here since the Price-Anderson Act does, in our view, provide a reasonably just substitute for the common-law or state tort law remedies it replaces.

438 U.S. at 88 (footnote omitted).

Following *Duke Power*'s lead, when this Circuit confronted a substantive due process challenge to a portion of the Atomic Energy Act abolishing individuals' ability to sue certain gov-

ernment contractors for injuries recognized at state common law in *Atmospheric Testing*, it upheld the Act on rational basis review only in conjunction with the observation that substitute remedies — both the Federal Tort Claims Act and veterans benefits legislation — were available to compensate the would-be plaintiffs for the unavailability of personal injury and wrongful death suits. *See Atmospheric Testing*, 820 F.2d at 990-91.[5] Other courts of appeal have done the same. *See, e.g.*, *Hammond*, 786 F.2d at 14 (noting that, in addition to the Federal Tort Claims Act's administrative scheme, "there may be government compensation available to many of those injured by radiation, including the plaintiff here, under veterans benefits legislation, . . . or the [Federal Employees Compensation Act]."); *Ducharme v. Merrill-Nat'l Labs.*, 574 F.2d 1307, 1309 (5th Cir. 1978) (upholding the Swine Flu Act's prohibition on tort suits against private manufacturers of swine flu vaccine, but also noting that "[t]he [substitute] cause of action provided by the Swine Flu Act to an injured person against the United States is substantially the same as that afforded . . . under [Louisiana law] except that under the Swine Flu Act no trial by jury is afforded and the plaintiff is required to seek first administrative review of his claim.")

Just as the federal courts are reluctant to construe a statute as abolishing common-law rules without providing *some* alternative method of redress, so Congress is reluctant to pass legislation immunizing a private industry from common-law tort liability — for example, when that industry is acting in concert with a governmental program or playing a vital role

---

[5]*Kyle Rys., Inc. v. Pacific Admin. Servs., Inc.*, 990 F.2d 513 (9th Cir. 1993), is not to the contrary. The plaintiff in *Kyle* had not filed a state claim for unjust enrichment at the time of ERISA's passage, so the property interest he was asserting was an interest in bringing a lawsuit, not in maintaining a pending one. *Kyle*, 990 F.2d at 518-19. Additionally, although ERISA did not furnish Kyle with a replacement federal cause of action, *id.* at 519, it does provide certain "quid pro quos" to individuals covered by employee benefit plans. The PLCAA, in contrast, provides nothing *but* a "gap in the law." *Id.*

in the nation's economy or defense — without preserving state tort law as a parallel track or providing some alternative mechanism to compensate injured parties.[6] Similarly, the Supreme Court has sometimes declined to read federal statutes as extinguishing the availability of state tort causes of action in preemption cases — even where no due process argument was advanced by the parties — when the statute lacks a clear statement that Congress intended to do so. *See, e.g.*, *Wyeth v. Levine*, 129 S.Ct. 1187, 1200 (2009); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002).

The statute at issue here is different. As interpreted by the majority, the PLCAA retroactively extinguishes Plaintiffs' pending state tort causes of action, *and* it leaves them without *any* remedy for the injuries they claim they have suffered due to Defendants' unlawful acts. No controlling case law establishes that such legislation survives constitutional scrutiny. Rather, the cases canvassed above suggest that at least a modified form of rational basis review, and perhaps a more searching type of review, may be warranted for such a statute.

More specifically, if one applied to a statute abolishing pending common-law causes of action and providing no alter-

---

[6]Consider, for example, the National Childhood Vaccine Injury Act, 42 U.S.C. §§ 300aa-1 *et seq.*, which provides a no-fault compensation scheme as an alternative to tort law, *see Schafer v. American Cyanamid Co.*, 20 F.3d 1, 1-2 (1st Cir. 1994); and the Air Transportation Safety and System Stabilization Act, 49 U.S.C. §§ 40101 *et seq.*, which creates a compensation fund and provides "an exclusive federal cause of action for . . . claims [arising out of the September 11, 2001, airplane crashes] to be brought in the Southern District of New York, and adjudicated on the basis of applicable state law." *Benzman v. Whitman*, 523 F.3d 119, 126 (2d Cir. 2008) (internal citations omitted). *But see* FISA Amendments Act of 2008, § 802, 122 Stat. 2436, Pub. L. No. 110-261 (July 10, 2008) (providing that a "civil action . . . in a Federal or State court" arising out of an individual or telephone company's cooperation with the government's counter-terrorism wiretap program "shall be promptly dismissed" upon the Attorney General's certification). No federal court has yet considered whether the FISA Amendments Act violates due process.

native remedy a test no more searching than the rational basis review applied to the Price-Anderson Act in *Duke Power*, it is possible that such a statute would be held to violate due process. *Duke Power* inquired whether "the legislature has acted in an arbitrary and irrational way," 438 U.S. at 84 (quoting *Usery*, 428 U.S. at 15), but, as part of its "arbitrary and irrational" inquiry, engaged in a lengthy examination of the Price-Anderson Act, taking into consideration among other things that the Act provided a compensation scheme that was a "reasonably just substitute" to the common law, *id.* at 88, and perhaps even an improvement on the common law.[7] In other words, the availability and effectiveness of alternative remedies was a factor in determining whether Congress had acted rationally or not. Thus, *Duke Power* applied a modified rational basis test, not unlike the due process test applied in cases involving retroactive legislation. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (economic legislation that Congress plainly intends to have retroactive effect must not only be rationally related to a legitimate state interest as a general matter, but there must also be a rational basis for its retroactive application). *Duke Power* suggests that, at a minimum, a modified rational basis test would apply here, rendering the PLCAA constitutional only if there were rational bases both for Congress's failure to supply any alternative remedies and for its decision to apply the

---

[7]*See id.* at 90-92 ("We view the congressional assurance of a $560 million fund for recovery, accompanied by an express statutory commitment[ ] to take whatever action is deemed necessary and appropriate to protect the public from the consequences of a nuclear accident, to be a fair and reasonable substitute for the uncertain recovery of damages of this magnitude from a utility or component manufacturer, whose resources might well be exhausted at an early stage . . . . Nor are we persuaded that the mandatory waiver of defenses required by the Act is of no benefit to potential claimants . . . . All of these considerations belie the suggestion that the Act leaves the potential victims of a nuclear disaster in a more disadvantageous position than they would be in if left to their common-law remedies — not known in modern times for either their speed or economy.") (internal citations omitted).

dismissal provision retroactively to extinguish the remedies for common-law injuries that had already occurred and were the subject of pending litigation.[8]

Alternatively, *Duke Power* leaves open the possibility that where the challenged statute leaves no alternative remedy available, the statute should be subject not to rational basis review but to a heightened form of scrutiny. *See Duke Power*, 438 U.S. at 88. Concurring in *PruneYard*, which upheld a California state constitutional limitation on the availability of private trespass claims against peaceful leafletters, Justice Marshall agreed that states may alter the protection of the common law to a point, but he emphasized:

> I do not understand the Court to suggest that rights of property are to be defined solely by state law, or that there is no federal constitutional barrier to the abrogation of common-law rights by Congress or a state government. The constitutional terms "life, liberty, and property" do not derive their meaning solely from the provisions of positive law. They have a normative dimension as well, establishing a sphere of private autonomy which government is bound to respect. Quite serious constitutional questions might be raised if a legislature attempted to abolish certain categories of common-law rights in some general way. Indeed, our cases demonstrate that there are limits on governmental authority to abolish "core" common-law rights, including rights

---

[8]Of course, as rational basis review does not require that legislation be the least restrictive means of achieving Congress's ends, the alternative remedy would not need to be an equally good substitute for the tort remedy it displaced. *See Atmospheric Testing*, 820 F.2d at 991 (acknowledging that "Congress could have . . . [achieved its goal of protecting independent government contractors from suit] and still provided those injured by radiation a more generous substitute compensation scheme," but concluding that "we cannot say that Congress'[s] choice of means was without any rational basis.") (internal quotation marks omitted).

> against trespass, at least without a *compelling show-ing of necessity* or a provision for a *reasonable alter-native remedy*.

*PruneYard*, 447 U.S. at 93 (Marshall, J., concurring) (footnote omitted; emphases added). In other words, even though no one has a protected property interest in any particular rule of the common law "entitling him to insist that it shall remain unchanged for his benefit," *White*, 243 U.S. at 198, an individual does have a weighty property interest in having *some* legal means available to redress an injury that would have been compensable at common law. Justice Marshall's concurrence in *PruneYard* suggests this interest may be so weighty as to require not merely a rational relation to a legitimate governmental interest, but a "compelling showing of necessity" — a heightened form of scrutiny. *PruneYard*, 447 U.S. at 93 (Marshall, J., concurring).

## C.

I will not venture further into this unsettled constitutional territory. For purposes of the avoidance canon, it is sufficient to determine that a serious constitutional question exists, and the case law I have just canvassed demonstrates that this is so. *Clark*, 543 U.S. at 381. The majority disagrees, noting that "[t]he dissent does not, and cannot, point to a single case in which we, the Supreme Court, or any sister circuit has held that a federal statute violates substantive due process for the reasons asserted by Plaintiffs." Maj. Op. at 5578. But that is precisely the point of the constitutional avoidance canon — to avoid open questions. As I have explained, the Supreme Court in *Duke Power* expressly left open the question whether "the Due Process Clause . . . requires that a legislatively enacted compensation scheme either duplicate the recovery at common law or provide a reasonable substitute remedy." *Duke Power*, 438 U.S. at 88. *See also PruneYard*, 447 U.S. at 93 (Marshall, J., concurring) (noting that the question whether Congress can constitutionally "abolish certain categories of

common-law rights in some general way . . . without a compelling showing of necessity or a provision for a reasonable alternative remedy" is unresolved). Nor has this Court ever *upheld* against constitutional challenge a statute with the same sweepingly preclusive effect on state tort remedies as the majority reads the PLCAA to have.[9] Precisely *because* we have no precedent to follow in resolving Plaintiffs' substantive due process challenge, we should not do so if we can avoid it.

I therefore cannot join the majority in rejecting on the merits Plaintiffs' substantive due process challenge. The applicable case law does not compel the majority's conclusions that, applying rational basis review, the PLCAA survives review. Nor does it foreclose the possibility that a focused form of rational basis review, taking special account of the retroactivity feature and the lack of any alternative means of redress, or, even, heightened scrutiny applies. Reading the PLCAA to extinguish Plaintiffs' claims without providing any alternative scheme for compensation thus raises serious constitutional questions that neither we nor the Supreme Court have resolved. I do not know how I would resolve these questions if they were unavoidably before me, but I am certain that they are more serious and complex than the majority's brief treatment suggests.

## II.

Given my view of the constitutional issue in this case, I am constrained to apply the venerable maxim of statutory interpretation prescribing that where ambiguous statutory language

---

[9]The majority asserts that "scores of cases concerning very similar statutes have held that the statutes do not violate substantive due process principles," Maj. Op. at 5579, but it cites to none. As I have shown above, *supra* note 4, each of the cases on which the majority relies in rejecting Plaintiffs' substantive due process argument involves a statute that is distinguishable from the PLCAA in some significant respect.

is capable of bearing two or more interpretations, courts should adopt the interpretation that does not raise a serious constitutional question "unless such construction is plainly contrary to the intent of Congress." *DeBartolo*, 485 U.S. at 575. *See also INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) ("[I]f an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' we are obligated to construe the statute to avoid such problems.") (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

As I explain below, there is such an alternative interpretation of the PLCAA's predicate exception: one that would avoid raising the substantive due process question altogether, by construing Plaintiffs' state-law causes of action as arising under "statute[s] . . . applicable to the sale and manufacture" of firearms. 15 U.S.C. § 7903(5)(A)(iii). This alternative interpretation is not only "fairly possible" in light of the statute's text and legislative history, *see St. Cyr*, 533 U.S. at 300 (internal citation and quotation marks omitted), but also preferable to the majority's reading raising the constitutional questions just outlined.

### A.

The PLCAA's predicate exception creates a carve-out from the PLCAA's mandatory dismissal provision for "action[s] in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii).

The ambiguity in this provision derives primarily from its use of the word "applicable." As the majority notes, the phrase "applicable to X" can mean, broadly, "capable of being applied to X," or, narrowly, "specifically or even exclusively relevant to X." Construing other statutes and enact-

ments, courts have read the word "applicable" more broadly or more narrowly, depending upon contextual clues. *See, e.g.*, *Fong v. Glover*, 197 F.2d 710, 711 (9th Cir. 1952); *McGee v. Peake*, 511 F.3d 1352 (Fed. Cir. 2008); *Snyder v. Buck*, 75 F. Supp. 902, 907 (D.D.C. 1948), *vacated on other grounds*, 179 F.2d 466 (D.C. Cir. 1950)). Like the majority, I think case law construing what Congress meant when it used the word "applicable" in other statutes unrelated to the PLCAA does little to illuminate the word's meaning here. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522-24 (1994). What is clear, at least, is that the predicate exception cannot possibly encompass *every* statute that might be "capable of being applied" to the sale or manufacture of firearms; if it did, the exception would swallow the rule, and no civil lawsuits would ever be subject to dismissal under the PLCAA. I therefore agree with the majority that a limiting principle must be found, and that rather than trying to locate it in the word "applicable" itself, we must look to the predicate exception's surrounding words.

In my view, the key to interpreting the predicate exception is Congress's use of the word "knowingly." 15 U.S.C. § 7903(5)(A)(iii). Generally speaking, a "knowing" violation of a given law requires "proof of [the defendant's] knowledge of the facts that constitute the offense." *Bryan v. United States*, 524 U.S. 184, 193 (1998); *see also* Cal. Penal Code § 7, para. 5 (stating that for purposes of the California Penal Code, "[t]he word 'knowingly' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code. It does not require any knowledge of the unlawfulness of such act or omission."). Knowing conduct thus stands in contrast to negligent conduct, which typically requires only that the defendant knew *or should have known* each of the facts that made his act or omission unlawful and/or the harm that was likely to occur.[10]

---

[10]*See* RESTATEMENT (THIRD) OF TORTS § 3, cmt. g ("To establish the actor's negligence, it is not enough that there be a likelihood of harm; the

Neither of the California statutes on which Plaintiffs' suit is based requires actual knowledge as a prerequisite for liability. The negligence statute, Cal. Civ. Code § 1714(a), requires as part of the proximate cause analysis that the harm caused by a defendant's act or omission be "reasonably foreseeable." *Lugtu v. Cal. Highway Patrol*, 26 Cal. 4th 703, 716 (2001). A private nuisance under the nuisance statute, Cal. Civ. Code §§ 3479-80, generally requires a showing that the defendant's act caused an "unreasonable invasion of [the plaintiff]'s interest in the free use and enjoyment of [hi]s property." *Hellman v. La Cumbre Golf & Country Club*, 6 Cal. App. 4th 1224, 1230 (1992). This "unreasonableness" factor plays a similar role to the "foreseeability" factor in the negligence context, and California courts have recognized that an action for nuisance will often require functionally the same showing as an action for negligence. *See El Escorial Owners' Ass'n v. DLC Plastering, Inc.*, 154 Cal. App. 4th 1337, 1349 (2007); *Pamela W. v. Millsom*, 25 Cal. App. 4th 950, 954 n.1 (1994); *Lussier v. San Lorenzo Valley Water Dist.*, 206 Cal. App. 3d 92, 103-04 (1988).

That neither Cal. Civ. Code § 1714 nor Cal. Civ. Code §§ 3479-80 requires knowing conduct is not the end of the inquiry. The PLCAA's predicate exception does not limit its application to suits for "violations of State or Federal statutes that require knowing conduct"; rather, it applies to suits for "knowing[ ] violation[s] [of] . . . State or Federal statute[s]." 15 U.S.C. § 7903(5)(A)(iii). The difference is material: The PLCAA's actual knowledge requirement can quite reasonably be read to create a mental-state overlay, a heightened requirement that a plaintiff must meet if his lawsuit is to proceed

---

likelihood must be foreseeable to the actor at the time of conduct. Foreseeability often relates to practical considerations concerning the actor's ability to anticipate future events or to understand dangerous conditions that already exist. In such cases, what is foreseeable concerns what the actor 'should have known.' ").

under the new PLCAA regime, regardless of whether the underlying statute requires such a mens rea.[11]

Plaintiffs here allege that Defendants knowingly committed a range of acts in violation of California negligence and nuisance law. Specifically, they allege that "Defendants . . . *knowingly* participate in and facilitate the secondary market where persons who are illegal purchasers[, including Furrow,] . . . obtain their firearms," First Amended Complaint ("FAC") ¶ 31 (emphasis added), and that "Defendant[s] . . . select and develop distribution channels that they *know* regularly provide guns to criminals and underage end users . . . [and, despite information from government crime trace reports,] *knowingly* supply a range of disreputable distributors, dealers, gun shops, pawnshops, gun shows, and telemarketers in the State of California . . . ." *Id.* ¶ 32 (emphases added).[12] Plain-

---

[11]I note, in addition, that Congress's use of the word "violation" does not necessarily suggest a distinction between common-law-based duties and legislatively-imposed duties. *Cf. Riegel v. Medtronic, Inc.*, 128 S.Ct. 999, 1008 (2008) ("Congress is entitled to know what meaning this Court will assign to terms regularly used in its enactments. Absent other indication, reference to a State's [']requirements['] includes its common-law duties. . . . [C]ommon-law liability is premised on the existence of a legal duty, and a tort judgment therefore establishes that the defendant has *violated a state-law obligation*.") (emphasis added); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486, 495 (1996) (plurality opinion) (holding that § 360k of the Medical Device Amendments, which preempts "any requirement (1) which is different from, or in addition to, any requirement applicable under this chapter to the device," does not "den[y] Florida the right to provide a traditional damages remedy for *violations of common-law duties* when those duties parallel federal requirements.") (emphasis added).

[12]Further, Plaintiffs' complaint alleges that "the easy availability of firearms for criminal purposes is a direct, *known* result of [D]efendants' marketing and distribution policies and practices." FAC ¶ 58 (emphasis added). Although the Bureau of Alcohol, Tobacco and Firearms has "reported . . . that . . . about 1% [of dealers nationwide] account for over half of the successfully traced guns used in crime," *id.* ¶ 49, and although ATF regularly forwards Defendants crime-trace data on particular distributors and dealers, Defendants "*choose* not to use the data . . . to change their

tiffs also allege that Defendants intentionally flood police departments with frequent waves of upgrades, enabling Defendants to resell police departments' retired models on the secondary market. And Plaintiffs allege that "Defendants have full *knowledge* that their policies and practices will and regularly do result in substantially increased levels of firearms use in crime . . . in California, and that their conduct . . . [unreasonably] interferes with the public safety, health or peace . . . ." *Id.* ¶ 126-29 (emphasis added).

With their allegations, Plaintiffs are not imputing vicarious liability to Defendants for Furrow's unlawful acts. Rather, they are alleging that Defendants themselves knowingly engaged in unlawful conduct: dangerous distribution and marketing practices, and the knowing maintenance of a nuisance. And while the majority is correct that Furrow's shooting was the last link in the causal chain that occasioned Plaintiffs' suit, *see* Maj. Op. at 5554 n.1, the violations of law for which Plaintiffs seek redress as against Defendants Glock and RSR are separate from the violations of law that Furrow himself committed. In other words, Plaintiffs advance a theory of direct liability, not vicarious liability, against Defendants. Their cause of action is premised on the allegation that Defendants' own wrongful conduct proximately caused them harm.[13]

---

marketing and distribution practices to reduce the foreseeable risk that their firearms will become possessed by prohibited persons." *Id.* ¶ 66 (emphasis added). Further, Plaintiffs allege, Defendant manufacturers choose not to train their dealers, *id.* ¶ 77, or to cut off contracts with distributors who sell to dealers with disproportionately high sale-to-crime rates. *Id.* ¶ 72. Defendants also allegedly market their products to appeal to prospective purchasers with criminal intent, emphasizing characteristics such as easy concealability and rapid fire capability. *Id.* ¶ 81-88.

[13]In this respect, the case law concerning suits against municipalities under 42 U.S.C. § 1983 may provide a useful analogy, as it throws the distinction between direct liability and respondeat superior — a type of vicarious liability — into sharper relief. Under *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), "a municipality cannot be held liable solely because

One could quarrel with Plaintiffs' theory of causation, to be sure, and perhaps they would lose on summary judgment or at trial. But this Court determined on a prior appeal that Plaintiffs have properly stated violations of California law (including satisfying the statutes' requirement of proximate cause) for purposes of surviving a motion to dismiss, *see Ileto v. Glock*, 349 F.3d 1191, 1194 (9th Cir. 2003), and that holding is the law of the case. Maj. Op. at 5558 & n.2. The question now before us is whether, assuming that Plaintiffs have stated violations of California law, they have also alleged sufficient facts to come within the PLCAA's predicate exception and avoid its mandatory dismissal requirement.

At the time Plaintiffs' complaint was originally filed, the PLCAA had not yet been enacted. So, by alleging that Defendants had actual knowledge of the impact of their intentional actions rather than that the impact was reasonably foresee-

it employs a tortfeasor — or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. But, *Monell* held, a municipality can be held *directly* liable for a violation of the Constitution or a federal law under § 1983 if its own "policy or custom . . . inflicts the injury[.]" *Id.* at 694. Later cases have clarified that a municipality will be liable for a policy of inadequate training or supervision of police officers only if the policy "reflects a 'deliberate' or 'conscious' choice by a municipality" not to avoid the risk of harm. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).

Suppose, for example, that a municipality maintains a policy of hiring police officers without running criminal background checks on them or providing firearms training, and that it knows several of its officers have committed violent crimes in the course of duty in the past. If a police officer hired and retained under this policy then shoots and kills a group of innocent bystanders, the municipality would not be liable to the victims for the *shooting* on a respondeat superior theory, but it would be directly liable for its *own* wrongful act: maintaining a policy of inadequate screening and supervision with "deliberate indifference" to the risk of harm that policy created. *See Bd. of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997). The violations are distinct, even though the same act — the shooting — occasions the victim's suit.

able, Plaintiffs put forward more than they needed to state a claim under the California statutes.[14] When Congress passed the PLCAA in 2005, though, it effectively raised the bar concerning what Plaintiffs must allege to avoid a motion to dismiss. As a result, even when the underlying state statute does not itself require "knowing" action, plaintiffs must now allege and, ultimately, prove such actions to survive PLCAA preemption.[15]

In short, Plaintiffs have presciently undertaken to prove that Defendants knew the impact of their actions and undertook them anyway, even though the underlying state statutes require only that Defendants should have known, and not that they actually knew, the impact of their actions. Because Plaintiffs have adequately and specifically pleaded actual knowledge, they have shown "knowing[ ] violat[ions]" of the

---

[14]I note, in this respect, that California courts do recognize "an aggravated form of negligence," sometimes called "willful misconduct," for which the "pleading requirements are similar to negligence but stricter": A plaintiff must show "(1) actual or constructive knowledge of the peril to be apprehended, (2) actual or constructive knowledge that injury is a probable, as opposed to a possible, result of the danger, and (3) conscious failure to act to avoid the peril." *Berkley v. Dowds*, 152 Cal. App. 4th 518, 526-28 (2007) (internal alterations, quotation marks, and citations omitted). The PLCAA, on my reading, would require something slightly more onerous: a showing of actual, not constructive, knowledge of all the elements that establish a violation of law.

[15]When Congress is acting in an area over which it has constitutionally delegated authority, there is nothing particularly unusual about a federal statute adding to the proof burdens that would be applicable under state law. *See*, *e.g.*, *Gorman v. Wolpoff & Abrahamson, LLP*, 552 F.3d 1008, 1025-27 (9th Cir. 2009) (holding that the Fair Credit Reporting Act permits state defamation claims to avoid preemption, if at all, only if plaintiffs plead and prove "malice or willful intent," a mens rea not inherent in most state defamation actions); *800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008) ("State tort claims against a patent holder, including tortious interference claims, based on enforcing a patent in the marketplace, are 'preempted' by federal patent laws, unless the claimant can show that the patent holder acted in 'bad faith' in the publication or enforcement of its patent.").

California statutes that form the basis for their suit. 15 U.S.C. 7903(5)(A)(iii).

Understanding the phrase "knowingly violated" as imposing a heightened pleading requirement for litigants who seek to come within the predicate exception thus gives sense and structure to an otherwise ambiguous provision. 15 U.S.C. 7903(5)(A)(iii). Having located the predicate exception's limiting factor, it makes sense to read the term "applicable" broadly, encompassing statutes that are "capable of being applied" to the sale or marketing of firearms, as Cal. Civ. Code §§ 1719 and 3479-80 certainly are.

## B.

My interpretation of the predicate exception is fully consistent with surrounding provisions of the PLCAA's text. Unlike the majority, I read the PLCAA's text as strongly supporting the view that the Act's purpose is to protect firearms manufacturers and sellers from liability for acts solely those of third parties.

First, according to the PLCAA's "Purposes" section, the purpose of the Act is "[t]o prohibit causes of action against manufacturers [and sellers] . . . for the harm *solely* caused by the criminal or unlawful misuse of firearm products or ammunition products by others." 15 U.S.C. § 7901(b)(1) (emphasis added). The majority ignores Congress's use of the word "solely," reading this provision to suggest that Congress's intention was "to preempt common-law claims, such as general tort theories of liability." Maj. Op. at 5564. I disagree. The purpose articulated at § 7901(b)(1) is, by its own terms, not to reject tort theories of liability in *general*, but rather to prevent claims alleging strict or vicarious liability.

Indeed, the PLCAA repeatedly describes the sorts of lawsuits with which Congress was concerned as lawsuits based particularly on vicarious liability theories. *See* 15 U.S.C.

§§ 7901(a)(3) ("harm caused by the misuse of firearms by third parties"); 7901(a)(5) ("harm caused by those who criminally or unlawfully misuse firearm products or ammunition products that function as designed and intended"); 7901(a)(6) ("harm that is solely caused by others"). Reading the predicate exception to encompass only lawsuits alleging that defendants themselves knowingly engaged in unlawful conduct is fully consistent with this purpose, as such a reading would preclude the filing of suits that allege liability arising solely out of acts taken by third parties which the defendants failed to correct or prevent.

Second, the majority notes that the PLCAA elsewhere speaks of "Federal, State, and local laws" that "heavily regulate[ ]" the manufacture and sale of firearms, 15 U.S.C. § 7901(a)(4), and it concludes that Congress likely had only this narrow subset of laws (apparently, firearm-specific laws and regulations) in mind when drafting the predicate exception as well. Maj. Op. at 5566. I draw precisely the opposite conclusion from Congress's choice of language in § 7901(a)(4). That subsection speaks of "Federal, State, and local *laws*" (not "statutes") that "heavily *regulate*[ ]" (rather than "apply to") firearms. *Id*. § 7901(a)(4) (emphases added). If Congress had intended the predicate exception to reach only those statutes *specifically regulating* the sale or marketing of firearms, to which it appears § 7901(a)(4) refers, surely the more straightforward way to do so would be to mirror the language of § 7901(a)(4) more closely. *See Boise Cascade Corp. v. United States Envtl. Prot. Agency*, 942 F.2d 1427, 1432 (9th Cir.1991) ("[W]e presume that words used more than once in the same statute have the same meaning."). Instead, Congress chose to use the broader phrase "State or Federal statute[s] applicable to the sale or marketing of [firearms]" in the predicate exception. *Id.* § 7903(5)(A)(iii). If any inference can be drawn from this difference in language, it is not that § 7901(a)(4) and § 7903(5)(A)(iii) should be read as coterminous, as the majority suggests, but that they should be read differently. *See Tang v. Reno*, 77 F.3d 1194, 1197 (9th

Cir. 1996) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

Third, the majority states that "Congress'[s] intention to create national uniformity" — an intention to which the PLCAA adverts only indirectly, in the "Purposes" section at 15 U.S.C. § 7901(b)(4) ("[t]o prevent . . . unreasonable burdens on interstate . . . commerce") — is incompatible with a reading of the predicate exception that would allow Plaintiffs' claims to survive. Maj. Op. at 5566. I disagree here as well. Reading the predicate exception to impose an actual knowledge requirement on litigants *does* create a nationally uniform baseline standard of liability. At the same time, this reading also accommodates another of the PLCAA's stated purposes — "preserv[ing] and protect[ing] the important principles of federalism [and] State sovereignty," 15 U.S.C. § 7901(b)(6) — by allowing the continued enforcement of state laws that, like California's, reflect the considered policy choices of the legislature. It is worth noting, in this regard, that the California Penal Code specifically states that the unlawful possession of a firearm is a nuisance. *See* Cal. Penal Code § 12028(b). And several years after Defendants committed the acts alleged in Plaintiffs' complaint, the California legislature amended the negligence statute to specify that "[t]he design, distribution, or marketing of firearms and ammunition is not exempt from the duty to use ordinary care and skill that is required by this section." Cal. Civ. Code § 1714(a); *see also* A.B. 496, 2002 Cal. Legis. Serv. 906 (West) (2002).

I therefore conclude that the PLCAA's text is fully consistent with the reading of the predicate exception I have suggested: that "statute[s] applicable to the sale or marketing of [firearms]" includes any statutes capable of being applied to the sale or marketing of firearms, but that to proceed under the exception, litigants must allege that defendants "know-

ingly violated" those statutes. 15 U.S.C. § 7903(5)(A)(iii). Far from "ignor[ing] the text and purpose of [the] statute," *see* Maj. Op. at 5568 n.8 (quoting *Boumediene v. Bush*, 128 S. Ct. 2229, 2271 (2008)), I think this to be an entirely fair reading of the PLCAA.

## C.

*DeBartolo* counsels that courts employing the canon of constitutional avoidance look not only to the statutory text, but also to the legislative history, to ensure that their reading of the statute is not contrary to Congress's clear intent. *DeBartolo*, 485 U.S. at 583-84; *see also Catholic Bishop*, 440 U.S. at 504. Unlike the majority, I read the PLCAA's legislative history not to foreclose the reading I suggest here, but rather in large part to support it.

Senator Sessions, one of the bill's leading supporters, stated that "[t]his bill is incredibly narrow. It only forbids lawsuits brought against lawful manufacturers and sellers of firearms or ammunition if the suits are based on criminal or unlawful misuse of the product by a third party." 151 Cong. Rec. S8908 (July 26, 2005) (statement of Sen. Sessions). Reading through the legislative history, it becomes clear that like Senator Sessions, the bill's supporters broadly understood that the PLCAA would not do away with all tort liability, but rather that it would (1) limit firearms manufacturers or sellers' tort liability to their *own conduct*, not the conduct of third parties (thus imposing a narrow view of foreseeability and proximate cause), and (2) impose an extra "knowledge" requirement on state-defined duties of care.[16] The bill was viewed essentially

---

[16]*See, e.g.,* 151 Cong. Rec. S9088 (July 27, 2005) (statement of Sen. Craig) ("[This bill] does not prevent [gun manufacturers and sellers] from being sued for their own misconduct. This bill only stops one extremely narrow category of lawsuits[:] lawsuits that attempt to force the gun industry to pay for the crimes of third parties over whom they have no control. We have tried to make that limitation as clear as we possibly can . . . .");

as a tort-reform measure, aimed at restraining the supposed expansion of tort liability beyond its "traditional[ ]" boundaries, 151 Cong. Rec. S8910 (July 26, 2005) (statement of Sen. Sessions), particularly by "activist judge[s]" and municipalities suing the gun industry on public nuisance and strict liability theories. *Id.* at S8911.**[17]** Suits for the wrongful acts of

---

*id.* (statement of Sen. Craig) ("This bill responds to a series of lawsuits filed primarily by municipalities to shift the financial burden for criminal violence onto the law-abiding business community. These suits are based on a variety of legal theories. . . . seeking to hold gun manufacturers and sellers liable for the cost of injuries caused by people over whom they have no control — criminals who choose to use firearms illegally."); *id.* at S9089 (statement of Sen. Craig) ("This is not a gun industry immunity bill. It prohibits one kind of lawsuit[:] a suit trying to fix the blame of a third party's criminal acts or misdeeds on the manufacturer or the seller of the firearm used in that crime."); 151 Cong. Rec. S8908-11 (July 26, 2005) (statement of Sen. Sessions) ("Manufacturers and sellers are still responsible for their own negligent or criminal conduct . . . ." ); *id.* ("It is simply wrong . . . to allow those manufacturers who comply with the many rules we have set forth . . . to be sued for intervening criminal acts . . . . [But] [i]f they knew, if they had reason to know, if they were negligent in going through the requirements of the law or failed to do the requirements of the law, they can [still] be sued [despite the PLCAA]"); *id.* at S8911 (statement of Sen. Sessions) ("Plaintiffs can go to court if the gun dealers do not follow the law, if they negligently sell the gun, if they produce a product that is improper or they sell to someone they know should not be sold to or did not follow steps to determine whether the individual was [eligible] to buy[ ] a gun."); 151 Cong. Rec. S9226 (July 28, 2005) (statement of Sen. Graham) ("What . . . [this bill will prohibit are suits that seek] under a gross negligence or simple negligence standard [to] create a duty on the part of sellers and manufacturers for an event that they can't control which is the intentional misuse of a weapon to commit a crime . . . ." ).

**[17]***See* 151 Cong. Rec. S9088 (July 27, 2005) (statement of Sen. Craig) ("This bill responds to a series of lawsuits filed primarily by municipalities to shift the financial burden for criminal violence onto the law-abiding business community."); *id.* at S9088-89 (statement of Sen. Craig) (characterizing the "junk lawsuits" that the PLCAA would prohibit as threatening to "reverse a longstanding legal principle in this country . . . that manufacturers of products are not responsible for the criminal misuse of those

firearms manufacturers and sellers themselves were not the focus of the dismissal provision.

I recognize, of course, that individual legislators at times suggested divergent views of what sorts of lawsuits the PLCAA would affect if it were passed into law.[18] Some of those views appear perhaps implausibly narrow or implausibly broad, likely because the bill excited strong emotions

products"); 151 Cong. Rec. S9378 (statement of Sen. Sessions) ("We ha[ve] a group of activist, anti-gun litigators who sometimes buddy up with a city or mayor somewhere — usually a big city — and try to conjure up some way to make a legitimate manufacturer of a firearm liable for intervening acts of criminals and murderers. That has never been the principle of American law, but it is a reality that is occurring today and it threatens an industry that supplies our military with weapons.").

Relatively little of the debates focused on tort suits brought by injured *individuals*, as opposed to municipalities. *But see* 151 Cong. Rec. S9386 (July 29, 2005) (statement of Sen. Reed) (advocating an amendment, which ultimately failed, that would have "preserve[d] the right of an individual to sue for negligence when they have been harmed and when that negligence can fairly be attributed to a gun manufacturer . . . [or] dealer . . . . [I]f we are confronted with this legislation, I propose we step back and perhaps reluctantly eliminate suits by municipalities, but for goodness sakes, we can have and maintain suits by individuals . . . . At a minimum, we have to allow the tort law of the various States . . . to be operative . . . ." ); *id.* at S9389 (July 29, 2005) (statement of Sen. Allen) (supporting the bill as written, and stating that "[t]his legislation does carefully preserve the right of individuals to have their day in court with civil liability actions for injury or danger caused by negligence on the firearms dealer or manufacturer['s part] or defective product . . . ." ).

[18]*Compare* 151 Cong. Rec. S9226 (July 28, 2005) (statement of Sen. Kyl) (supporting the bill and opposing an amendment that would have expressly permitted suits alleging gross negligence or recklessness to go forward; arguing that the bill as written already would allow suits alleging "gross negligence or reckless conduct . . . [as] the proximate cause of death or injury"), *and* 151 Cong. Rec. S9926 (July 25, 2005) (statement of Sen. Graham) (same), *with* 151 Cong. Rec. S9385 (July 29, 2005) (statement of Sen. Schumer) (opposing the bill as written, and arguing that "[e]ven when somebody is grossly negligent . . . they will" be immune from suit), *and id.* at S9380 (statement of Sen. Kennedy) (same).

from both its supporters and its opponents. As courts have long cautioned, however, the statements of single lawmakers do not establish congressional intent. *Thompson v. Calderon*, 151 F.3d 918, 928-29 (9th Cir. 1998) ("[I]ndividual senators do not make laws; majorities of the House and Senate do."); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979). That is why committee reports are more persuasive indicators of "the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation." *Garcia v. United States*, 469 U.S. 70, 76 (1984) (internal quotation marks omitted); *see also Gen. Elec. Co. v. EPA*, 360 F.3d 188, 193-94 (D.C. Cir. 2004) (the broad reading of an ambiguous statutory preemption provision put forward in the "floor statement by a single senator" is "hardly persuasive evidence of congressional intent" in the face of committee reports that read the provision more narrowly).

Here, the House Judiciary Committee Report confirms the picture that emerges from the legislative history as a whole — that the PLCAA was intended to preclude the imposition of strict or vicarious liability on the gun industry for the criminal actions of third parties. The House Report describes the bill as aimed at combating a trend of "[r]ecent litigation . . . against the firearms industry . . . based on novel claims that invite courts to dramatically break from bedrock principles of tort law," H.R. REP. NO. 109-124, at 11 (2005), and to hold firearms manufacturers and sellers "liable for the injuries caused by the criminal action of third parties." *Id.* at 6.[19]

---

[19]Like the floor debates, much of the House Report focuses on the perceived need to curtail lawsuits brought by municipalities, rather than those brought by individuals. *See id.* at 18 (describing municipal plaintiffs as attempting to "regulate firearms whereas only the State had the power to regulate in this area"); *id.* at 13 ("The various public entities that have brought suit against the gun industry in recent years have raised novel claims that seek reimbursement of government expenses — including costs for police protection, emergency and medical services, and pension benefits — associated with gun-related crimes."). (No Senate Report was published.)

Reading the predicate exception as preserving causes of action for injuries caused by gun manufacturers and sellers' own knowingly unlawful conduct is fully consistent with that view.

The majority correctly points out that both Senator Craig and Representative Stearns listed *Ileto v. Glock* among the lawsuits that they expected the PLCAA would preempt. *See* Maj. Op. at 5567-68. But there is no indication in their descriptions of the case that these lawmakers actually understood what Plaintiffs were alleging in this case: that Defendants themselves *knowingly* committed unlawful acts. Quite the contrary, Senator Craig and Representative Stearns's remarks suggest that they believed *Ileto* was purely a vicarious liability suit.[20] Whatever effect these two lawmakers *thought* the PLCAA would have on Plaintiffs' suit, their apparently ill-informed projections do not amount to "clear congressional intent" to enact a law that would immunize firearms manufacturers and sellers from tort liability for even their *own knowing* unlawful acts. *DeBartolo*, 485 U.S. at 574.

D.

Applying the PLCAA's predicate exception as written — that is, as applying to all statutes capable of being applied to the sale or marketing of firearms, but imposing an actual

---

[20]*See* 151 Cong. Rec. S9394 (July 29, 2005) (statement of Sen. Craig) ("Another example of a lawsuit captured by this bill is the case of *Ileto v. Glock* . . . . The United States Ninth Circuit Court of Appeals said Glock and RSR could be sued for a criminal shooting when Glock sold the pistol to a Washington State police department and the distributor RSR never owned, nor sold, nor possessed the firearm."); 151 Cong. Rec. E2163 (Oct. 25, 2005) (statement of Rep. Stearns) (extensions of remarks) ("Another example is the case of *Ileto v. Glock* . . . . The facts, if you can believe it, are that the manufacturer, Glock, sold the pistol later criminally misused, to a Washington State police department and the distributor being sued never owned, sold, nor possessed the firearm that was criminally misused.").

knowledge requirement — would prohibit a swath of lawsuits against firearms manufacturers and sellers, including those brought by municipalities for violations of no-fault or absolute liability statutes or those brought by individuals alleging vicarious liability under state tort law for the conduct of third parties of which the gun manufacturers or sellers were not aware.

It may well be that the PLCAA's application to these other state actions would be constitutionally problematic for the same reasons outlined in Part II above. The reading of the predicate exception's ambiguous language I have suggested might simply delay those hard constitutional questions for another case. But that is, ultimately, what the canon of constitutional avoidance is meant to do.[21] The legislation or the constitutional law could change in the meantime, or no concrete case could arise in which the constitutional issue needs to be addressed. The reading I have suggested here would resolve the case in front of us, allowing Plaintiffs' suit to go forward and leaving the constitutional issue for another day, should that day arise.

## CONCLUSION

I would hold that the PLCAA does not require the dismissal of Plaintiffs' suit, and not decide the difficult questions of constitutional law that the statute would otherwise raise. I therefore respectfully dissent.

---

[21]The majority asserts that the "point" of the constitutional avoidance canon "is to adopt an alternative interpretation of the statute that avoids *any* constitutional problem." Maj. Op. at 5579 n.12 (emphasis added). But surely, that is not so. The point, rather, is avoid constitutional questions actually *raised* by a given case. Whatever constitutional problems might be raised in other cases — or even in this one at a later stage in the litigation, if Plaintiffs were unable to prove the knowing conduct they have pleaded and could show only negligence — are not before us today, and cannot guide our choice between two plausible readings of the statute when one would raise a serious constitutional question in *this* case.