**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SECRETARY OF LABOR, U.S.
Department of Labor,

*Petitioner*,

v.

SEWARD SHIP'S DRYDOCK, INC.,

*Respondent.*

No. 18-71216

OSHC No.
09-1901

OPINION

On Petition for Review of an Order of the
Occupational Safety & Health Review Commission

Argued and Submitted June 13, 2019
Anchorage, Alaska

Filed September 11, 2019

Before: A. Wallace Tashima, William A. Fletcher,
and Marsha S. Berzon, Circuit Judges.

Opinion by Judge W. Fletcher

# SUMMARY[*]

## Occupational Safety and Health Review Commission

The panel granted the Secretary of Labor's petition for review of a decision of the Occupational Safety and Health Review Commission interpreting a provision of the Respiratory Protection Standard promulgated under the Occupational Safety and Health Act of 1970, 29 C.F.R. § 1910.134.

The panel adopted the Secretary's interpretation of § 1910.134(d)(l)(iii), requiring covered employers to evaluate the respiratory hazards at their workplaces whenever there is the "potential" for overexposure of employees to contaminants, in order to determine whether respirators are "necessary to protect the health" of employees. The panel held that the text, structure, purpose, and regulatory history of the Standard all pointed in the same direction, and the panel adopted the Secretary's interpretation without resorting to *Auer* deference.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Louise McGauley Betts (argued), Senior Attorney; Charles F. James, Counsel for Appellate Litigation; Edmund C. Baird, Acting Associate Solicitor of Labor for Occupational Safety and Health; Kate O'Scannlain, Solicitor of Labor; United States Department of Labor, Washington, D.C.; for Petitioner.

No appearance by Respondent.

---

**OPINION**

W. FLETCHER, Circuit Judge:

We are asked to interpret a provision of the Respiratory Protection Standard ("Standard"), promulgated under the Occupational Safety and Health Act of 1970. 29 C.F.R. § 1910.134. Section 1910.134(a)(2) of the Standard provides, "A respirator shall be provided to each employee when such equipment is necessary to protect the health of such employee." The lead sentence of § 1910.134(d) provides, "This paragraph requires the employer to evaluate respiratory hazard(s) in the workplace[.]" Section 1910.134(d)(1)(iii), whose meaning is at issue in this case, provides, "The employer shall identify and evaluate the respiratory hazard(s) in the workplace[.]"

The Secretary of Labor ("Secretary") has consistently interpreted § 1910.134(d)(1)(iii) to require covered employers to evaluate the respiratory hazards at their workplaces whenever there is the "potential" for overexposure of employees to contaminants, in order to determine whether respirators are "necessary to protect the

health" of employees. In the case now before us, the Occupational Safety and Health Review Commission ("Commission") disagreed with the Secretary. The Commission held that § 1910.134(d)(1)(iii) applies only when respirators have already been determined to be "necessary." In the view of the Commission, the only function of an evaluation under § 1910.134(d)(1)(iii) is to provide guidance as to which respirator an employer should use once respirators have been determined to be "necessary."

We have jurisdiction under 29 U.S.C. § 660(a). We adopt the Secretary's interpretation of § 1910.134(d)(1)(iii). We accordingly grant the petition for review.

## I.  Regulatory Framework

We begin with an overview of the Respiratory Protection Standard. The Standard was promulgated under the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651, *et seq*., pursuant to the Secretary's rulemaking authority. The Standard was first issued in 1971. It applies to industrial facilities in which respiratory hazards are likely to be present. One such facility is a shipyard. 63 Fed. Reg. 1152, 1178–79 (January 8, 1998). The Standard is enforced by the Occupational Safety and Health Administration ("OSHA").

In its first subsection, the Standard describes its overall purpose. The Standard seeks to "control . . . occupational diseases caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors[.]" 29 C.F.R. § 1910.134(a)(1). The "primary objective" of the Standard is "to prevent atmospheric contamination." *Id.* The

Standard prescribes the methods by which employers should protect their employees from contamination:

> [Protecting employees from atmospheric contamination] shall be accomplished as far as feasible by accepted engineering control measures (for example, enclosure or confinement of the operation, general and local ventilation, and substitution of less toxic materials).    When effective engineering controls are not feasible, or while they are being instituted, appropriate respirators shall be used pursuant to this section.

*Id.* The Standard provides that respirators must be provided when "necessary":

> A respirator shall be provided to each employee *when such equipment is necessary to protect the health of such employee.* The employer shall provide the respirators which are applicable and suitable for the purpose intended. . . .

*Id.* § 1910.134(a)(2) (emphasis added).

The Standard does not define or describe the conditions under which respirators are "necessary." However, a separate regulation specifies permissible exposure limits ("PELs") for various air contaminants.    The regulation requires that "administrative or engineering controls" be implemented to keep exposures below the specified PELs.    29 C.F.R. § 1910.1000(e).    If such controls do not achieve "full compliance," "protective equipment or any other protective

measures shall be used[.]" *Id.* Respirators are "protective equipment." PELs for specific contaminants are set forth in three tables in § 1910.1000.

Section 1910.134(d) of the Standard is titled "Selection of respirators." It begins, "*This paragraph requires the employer to evaluate respiratory hazard(s) in the workplace*, identify relevant workplace and user factors, and base respirator selection on these factors." (Emphasis added.) Section (d)(1), "General requirements," has four subsections. One of them is § 1910.134(d)(1)(iii), the provision whose meaning is at issue in this case. It provides in its entirety:

> *The employer shall identify and evaluate the respiratory hazard(s) in the workplace*; this evaluation shall include a reasonable estimate of employee exposures to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form. Where the employer cannot identify or reasonably estimate the employee exposure, the employer shall consider the atmosphere to be IDLH [immediately dangerous to life or health].

(Emphasis added.)

Section 1910.134(d)(1)(iii) was added to the Standard in 1998. A lengthy "preamble" was published with the revised Standard. The first two sentences addressing the newly added section provide:

> *Section (d)(1)(iii) of the final rule requires the employer to identify and evaluate the*

> *respiratory hazard(s) in the workplace.* To perform this evaluation, the employer must make a "reasonable estimate" of the employee exposures anticipated to occur as a result of those hazards, including those likely to be encountered in reasonably foreseeable emergency situations, and must also identify the physical state and chemical form of such contaminant(s).

63 Fed. Reg. at 1198 (emphasis added). The preamble goes on to explain that "[m]any of the components of paragraph (d)(1)(iii) of the final standard have been required practice since 1971 because they were included in the selection provisions of the 1969 ANSI [American National Standards Institute] standard incorporated by reference into [the] previous respiratory protection standard." *Id.* Section 1910.134(d)(1)(iii) simply "makes these provisions clearer by stating them explicitly in the regulatory text." *Id.*

An "OSHA Instruction," interpreting the Standard, was issued in 1998. A slightly revised Instruction was issued in 2014. The stated purpose of the Instruction in both versions was (and is) as follows: "This Instruction establishes agency interpretations and enforcement policies, and provides instructions to ensure uniform enforcement of the Respiratory Protection Standard[.]" Inspection Procedures for the Respiratory Protection Standard, CPL 02-00-158, § I (June 26, 2014) ("2014 Instruction"); Inspection Procedures for the Respiratory Protection Standard, CPL 2-0.120, § I (Sept. 25, 1998) ("1998 Instruction"). The 2014 Instruction provides:

> The employer is required to select and provide an appropriate respirator (NIOSH certified)

> based on the respiratory hazard(s) present in the workplace. The employer must identify hazardous airborne contaminants that employees may inhale and make a reasonable estimate of employee exposures in determining the appropriate respirator for employees to use. The employer must evaluate the respiratory hazards in the workplace where there is a *potential for an employee overexposure.*

2014 Instruction, at § IX(D) (emphasis added). The comparable passage in the 1998 Instruction provided exactly the same, but without the last sentence. 1998 Instruction, at § VII(E) (first two sentences). In a passage one page later, the 1998 Instruction included a roughly equivalent sentence:

> If the employer has not made any effort to assess the respiratory hazards and there is the *potential for an overexposure*, the CSHO should cite section (d)(1)(iii).

*Id.* at § VII(E)(2) (first sentence) (emphasis added). The critical point is that under both the 1998 and 2014 Instructions, employers were (and are) required to assess respiratory hazards based on the "potential" for overexposure of an employee. That is, an assessment for respiratory hazards is required even if it turns out that respirators are not "necessary to protect the health" of employees. The assessment is required whenever there is a "potential" for overexposure.

 With this framework in mind, we turn to the facts giving rise to the present petition.

## II. Factual Background

In 2009, OSHA issued several citations to respondent Seward Ship's Drydock, Inc. ("Seward") related to working conditions on the *Paula Lee*, a deck barge. Seward was a marine vessel repair business located in Seward, Alaska. It performed both "drydock" repairs, where the vessel is out of the water, and "dockside" repairs, where the vessel is floating in the water. According to the Secretary, respondent Seward no longer conducts repairs but still exists as an employer and would be subject to any penalty assessed. Seward elected not to file an answering brief in this court and did not appear for oral argument.

In February 2009, Seward performed welding work in the voids of the *Paula Lee*. "Voids" are compartments in a deck barge that can be left empty to provide buoyancy or can be filled with water to provide ballast. Prior to beginning repairs, Seward obtained a "Marine Chemist Certificate" from Joseph Graham, a certified marine chemist. Graham inspected the drydocked *Paula Lee*, tested the oxygen levels in each void, and tested for combustible gases and toxic substances. Graham certified the vessel as safe for drydock welding (also known as "hot work") on February 9, 2009. As is customary for purposes of a Marine Chemist Certificate, Graham was not told what types of welding rods Seward planned to use. Graham therefore could not test for fumes that would be produced by welding. Indeed, Graham testified in the administrative hearing, "I don't know how to test for welding fumes."

Seward spent five weeks conducting extensive repairs through "production welding," which involves long, continuous welds of large plates of replacement steel. On

April 11, 2009, Seward refloated the *Paula Lee* and placed it dockside. A few days later, Seward discovered the need for additional "pick-up" work, which involved spot welding of seams that were not fully closed during production welding.

Seward spent three days performing pick-up work, from April 14 through April 16. Employees spent up to ten hours per day in voids of the *Paula Lee* in order to meet the project's April 17 deadline. The voids were located underneath the main deck and were accessible only through manholes approximately 19 inches wide. Respirators were offered on a voluntary basis, and at least one welder used a respirator.

Each morning before welding began, Larry Williams, the site's superintendent and the designated "shipyard competent person," conducted atmospheric testing in the areas where work would take place. As the shipyard competent person, Williams was responsible for maintaining the conditions described in the Marine Chemist Certificate. Before welding began, Williams tested the voids using a "grab sample," which provides an immediate measurement from a gas meter. His tests determined whether the spaces were "safe for entry" at the time the test was performed.

Williams's pre-welding sampling did not test for the metals found in welding fumes. Welding fumes have different constituent elements depending on the composition of the electrode—or welding rod—used during welding. According to material safety data sheets, the two types of electrodes used on the *Paula Lee* contained iron oxide, manganese, fluorides, and barium compounds. Overexposure to these substances can cause both short- and long-term respiratory difficulties. For example, overexposure to iron

oxide can cause a condition called "siderosis," commonly known as "iron lung."

Henry "Joe" Hogge and Bruce Whitmore worked as welders on the *Paula Lee.* They testified at the administrative hearing about the conditions they experienced during the pick-up work. Hogge described the air quality within the voids as "extremely poor." He testified that there was "inadequate ventilation" in the void because the fan placed over the manhole cover to provide forced ventilation pulled out fumes only from the top of the void, leaving fumes near the bottom of the void where the welders were working. The void filled "quite quickly" with welding fumes, making it "very smokey . . . to the point where visibility was bad and it was difficult to breathe in." "It was a lot of brown smoke, a lot of welding fumes. . . . [T]he ventilation was so poor that Bruce and I both came in one day and we couldn't hardly even speak. [O]ur—our voices were—were very raspy[,] and I attribute that to the smoke." Whitmore similarly described the "smoke conditions from welding" as "terrible." He testified that the "air handlers and smoke exhaust fans were not working." The smoke "was very, very thick." "I had lost my voice. Joe had lost his voice. And it was—it was a continuous thing."

On April 14, after welding had begun, Hogge and Whitmore complained about the smoke and lack of effective ventilation. Hogge testified that he "complained about [how] there had been no air monitoring done that day, and we were expected to go into the hole." In response, Williams conducted a "grab sample" by lowering an "air monitor" about six inches into a void. Hogge testified that when Williams put the monitor into the void, there was "an audible alarm." Whitmore asked Williams what it meant. Hogge

testified that Williams replied, "It's to let you know you're still alive." Whitmore testified similarly: "And he says it meant—it means you're alive, you know, or some derogatory—some kind of statement like that. And I said, 'Well, what does that mean?' And there was no response."

Hogge and Whitmore called OSHA on April 14 to make a complaint. OSHA dispatched two compliance officers, Mathew Pauli and John Casper, to inspect the *Paula Lee*. Pauli and Casper were on site during the evening of April 14 and during the day of April 15.

Pauli and Casper testified that upon arriving the evening of April 14, they observed welders working in a void without adequate ventilation and with visible welding fumes. The following day, Pauli and Casper took two "grab samples" to test for carbon monoxide and fitted two welders with "personal exposure monitoring" devices to test for iron oxide and other possible contaminants. Personal exposure monitoring requires employees to wear a measuring device for a sustained period. The device samples the air and identifies the chemicals and contaminants, and their concentrations, to which an employee is exposed. OSHA considers personal exposure monitoring the "gold standard" of air testing because it is more reliable than other forms of testing such as grab samples. 63 Fed. Reg. at 1199.

The results of the personal exposure monitoring were placed into the record in the administrative hearing for only one of the two employees. As discussed above, respirators are "necessary" if exposure to an air contaminant exceeds OSHA's PEL for that contaminant. OSHA's PELs are based on an eight-hour "time-weighted average," which measures the average concentration of a substance over that time

period.  The PEL for iron oxide is 10 milligrams per cubic meter for eight hours.  The personal exposure monitor on the Seward employee measured an exposure of 9.1 milligrams per cubic meter for 6.5 hours.

Following the inspection and testing, OSHA issued a "Citation and Notification of Penalty" alleging thirteen violations of the Occupational Safety and Health Act.  A hearing was conducted before an Administrative Law Judge ("ALJ") in March 2011.  The ALJ sustained a number of the citations, assessing a total penalty of $34,000.  The ALJ vacated the citation at issue in the petition before us—Citation 1, Item 3.  That citation alleged as follows:

> 29 C.F.R. § 1910.134(d)(1)(iii):  The employer did not identify and evaluate the respiratory hazard(s) in the workplace to include a reasonable estimate of employee exposures to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form . . . :  Paula Lee Barge:  On or about April 14, 2009 and at times prior thereto, respiratory hazards for welders and helpers working in confined spaces had not been evaluated. This condition exposed employees to inhalation hazards.

Seward argued to the ALJ that it had complied with § 1910.134(d)(1)(iii) because a certified marine chemist had tested the voids in the *Paula Lee* and certified them as safe for hot work.  The ALJ agreed.  After recounting the testing done by Joseph Graham, the ALJ wrote, "[T]he Marine Certificate on its face indicated an evaluation of respiratory hazards with no conditions which required correction. . . .

Therefore, the court concludes that Respondent did evaluate the respiratory hazards on the *Paula Lee*."

The Secretary petitioned the Occupational Safety and Health Review Commission for review of the ALJ's decision to vacate Citation 1, Item 3.  In 2012, the parties conducted a full round of briefing on whether Seward had adequately evaluated respiratory hazards in compliance with § 1910.134(d)(1)(iii).

Over a year later, on April 17, 2013, the Commission *sua sponte* asked the parties to submit supplemental briefing on "whether the requirement to 'identify and evaluate the respiratory hazard(s) in the workplace' under § 1910.134(d)(1)(iii) is contingent on the Secretary showing that respirators were 'necessary to protect the health of [Seward's] employee[s]' under § 1910.134(a)(2)." (Second alteration in original.)  The parties' prior briefing, as well as the ALJ's decision, had been premised on the understanding that § 1910.134(d)(1)(iii) required employers to evaluate respiratory hazards as an initial matter to determine *whether* respirators are necessary under § 1910.134(a)(2).  Neither the parties nor the ALJ had understood § 1910.134(d)(1)(iii) to require evaluation of respiratory hazards only after a determination had been made that respirators were necessary.

More than four years after the conclusion of supplemental briefing, the Commission unanimously concluded that § 1910.134(d)(1)(iii) is unambiguous, and that it requires an evaluation of respiratory hazards only when respirators are "necessary to protect the health" of employees under § 1910.134(a)(2).  In the alternative, the Commission held that even if the language is ambiguous, the Secretary's interpretation is unreasonable and not entitled to deference.

Two Commissioners concluded that the Secretary had failed to prove that air contaminants were present at levels that made the use of respirators "necessary," and that Seward had therefore not been required to perform an evaluation under § 1910.134(d)(1)(iii). The third Commissioner dissented, concluding that the Secretary established that respirators had been "necessary" and that an evaluation under §1910.134(d)(1)(iii) was therefore required.

The Secretary petitioned for review in this court.

### III.  Meaning of 29 C.F.R. § 1910.134(d)(1)(iii)

"[W]e presume that Congress intended for courts to defer to agencies when they interpret their own ambiguous rules." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414 (2019). In the case of OSHA regulations like the one at issue here, "a reviewing court may not prefer the reasonable interpretations of the Commission to the reasonable interpretations of the Secretary." *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 158 (1991). But, as the Supreme Court wrote in *Kisor*, "The possibility of deference can arise only if a regulation is genuinely ambiguous[,] . . . even after a court has resorted to all the standard tools of interpretation." 139 S. Ct. at 2414. To determine whether a regulation's meaning is truly ambiguous, courts must "carefully consider the text, structure, history, and purpose of a regulation." *Id.* at 2415 (internal quotation marks omitted). "Doing so will resolve many seeming ambiguities out of the box." *Id.*

We conclude that § 1910.134(d)(1)(iii) is sufficiently clear that it is not "genuinely ambiguous" under *Kisor*. Section 1910.134(d)(1)(iii) requires covered employers to evaluate respiratory hazards that exist in the workplace in

order to determine *whether* respirators must be provided. There is no threshold requirement that respirators be found "necessary" in order to trigger such an evaluation.

### A.  Text and Structure of the Regulation

We begin with the text and structure of § 1910.134(d)(1)(iii).  "A regulation should be construed to give effect to the natural and plain meaning of its words." *Bayview Hunters Point Cmty. Advocates v. Metro. Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir. 2004) (quoting *Crown Pacific v. Occupational Safety & Health Review Comm'n*, 197 F.3d 1036, 1038 (9th Cir. 1999)).

Section 1910.134(d)(1)(iii) requires an employer to "identify and evaluate the respiratory hazard(s)" in the workplace.  The dictionary defines "hazard" in relevant part to mean "a thing or condition that *might* operate against success or safety: a *possible* source of peril, danger, duress, or difficulty."  Webster's Third New International Dictionary Unabridged (1961) (emphases added); *see also* Oxford English Dictionary Online (defining hazard as "a physical object which is regarded as a source of *potential* difficulty or danger") (last visited July 30, 2019) (emphasis added). Consistent with this definition, the Secretary has interpreted § 1910.134(d)(1)(iii) to require evaluation of respiratory hazards whenever there is "potential" for overexposure of employees.

The Commission disagreed with this interpretation of § 1910.134(d)(1)(iii).  Under the Commission's interpretation, § 1910.134(d)(1)(iii) is triggered only if a respirator is "necessary to protect the health" of employees under § 1910.134(a)(2).  The sole purpose of

§ 1910.134(d)(1)(iii), according to the Commission, is to enable the employer to choose the correct respirator. The Commission wrote, "This requires the Secretary to show there was a significant risk of harm necessitating the use of respirators." *See Weirton Steel Corp.*, 20 BNA OSHC 1255, 1259 (No. 98-0701, 2003). A "significant risk of harm" exists if "a reasonable person familiar with the circumstances surrounding an allegedly hazardous condition . . . would recognize a hazard warranting the use of protective equipment." *See Owens-Corning Fiberglass Corp.*, 7 BNA OSHC 1291, 1295 (No. 76-4990, 1979), *aff'd on other grounds*, 659 F.2d 1285 (5th Cir. 1981). More specifically, as we noted above, respirators are "necessary" under the Secretary's regulations if the exposure level for a specified air contaminant exceeds OSHA's maximum permissible exposure limit for that contaminant. 29 C.F.R. §1910.1000(e).

The Commission gave two reasons for its reading of § 1910.134(d)(1)(iii). Neither is persuasive.

First, the Commission wrote that the word "the" before "respiratory hazard(s)" "plainly presumes that such hazards are present and directs the employer to assess them; the provision does not state that the employer must evaluate the workplace *for* such hazards." (Emphasis in original.) The Commission is not correct that § 1910.134(d)(1)(iii) "presumes that [respiratory] hazards are present." Section 1910.134(d)(1)(iii) requires employers to both "*identify* and evaluate the respiratory hazard(s) in the workplace." (Emphasis added.) The word "identify" indicates that, contrary to the Commission's analysis, the regulation applies even where an employer does not already know of hazards in the workplace. And, the fact that employers must "identify

. . . the respiratory hazard(s) in the workplace" indicates that in some circumstances, employers carrying out such duty will identify no such hazards.

In light of the clear meaning expressed by the term "identify," the Commission's dispositive reliance on the regulation's use of the word "the" was improper. Where, as here, there are better indicators of a regulation or statute's meaning, we have rejected excessive reliance on the distinction between definite articles such as "the" and indefinite articles such as "a" and "any." *See, e.g.*, *Ileto v. Glock, Inc.*, 565 F.3d 1126, 1145–46 (9th Cir. 2009); *City of Ketchikan v. Cape Fox Corp.*, 85 F.3d 1381, 1384 (9th Cir. 1996); *see also Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1074 (9th Cir. 2016); *NLRB v. New Vista Nursing & Rehab.*, 719 F.3d 203, 227–28 (3d Cir. 2013).

Second, the Commission placed great weight on the location of § 1910.134(d)(1)(iii) in the subsection titled "Selection of respirators," "alongside provisions that deal exclusively with either respirator selection factors or respirator specifications." To start, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947). Further, it not unreasonable to include a provision requiring employers to assess *whether* it is necessary to select a respirator within a subsection on the "selection of respirators."

## B.  Purpose and History of the Regulation

We thus find little or no ambiguity in the plain text of the regulation. Any ambiguity that might remain is dispelled by the purpose of the Standard and its regulatory history. *See*

*Kisor*, 139 S. Ct. at 2415 ("[B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction. . . . To make that effort, a court must 'carefully consider[ ]' the text, structure, *history, and purpose* of a regulation[.]" (emphasis added)).

The Standard's "primary objective" is "to prevent atmospheric contamination" in order to prevent employees working in industrial facilities from experiencing "occupational diseases caused by breathing air contaminated with harmful dusts, fogs, fumes, mists, gases, smokes, sprays, or vapors." 29 C.F.R. § 1910.134(a)(1). To achieve this goal, the Standard requires an employer first to put in place engineering control measures, such as ventilation, as feasible. Only if those measures are not feasible or are inadequate is the employer required to use respirators. *See id.* Under the Commission's reading, employers would be required to evaluate respiratory hazards only *after* it becomes clear that employees will be overexposed without a respirator. But such a reading undermines the Standard's goals of *preventing* exposure to atmospheric contamination in the first place. Without an initial evaluation of respiratory hazards, employers would not be able to assess whether the engineering control measures they employ—if any—are sufficiently protective of employee health.

The regulatory history of the Standard also supports our reading. In the preamble to the Standard, the discussion of § 1910.134(d)(1)(iii) begins,

> Paragraph (d)(1)(iii) of the final rule requires the employer to identify and evaluate the respiratory hazard(s) in the workplace. To perform this evaluation, the employer must

> make a "reasonable estimate" of the employee *exposures anticipated to occur* as a result of those hazards, including those likely to be encountered in reasonably foreseeable emergency situations, and must also identify the physical state and chemical form of such contaminant(s).

63 Fed. Reg. at 1198 (emphasis added). The "exposures anticipated to occur" plainly include all exposures, not just those that exceed a contaminant's permissible exposure limit. This text directly contradicts the Commission's understanding that actual or anticipated *over*exposure is a prerequisite to a § 1910.134(d)(1)(iii) evaluation.

The preamble's discussion of the appropriate tools for an evaluation under § 1910.134(d)(1)(iii) reiterates the purpose of that evaluation. The preamble states, "OSHA recognizes that there are many instances in which it may not be possible or necessary to take personal exposure measurements *to determine whether respiratory protection is needed*." *Id.* at 1199 (emphasis added). The preamble then discusses alternate acceptable methods to estimate exposure, such as data from industry-wide surveys and mathematical analysis. *See id.* The preamble continues that, under certain circumstances, employers may nonetheless "find it easier and less costly to conduct personal exposure monitoring *to evaluate the need for respiratory protection*." *Id.* (emphasis added). OSHA clearly intended for an evaluation to first determine *whether* a respirator is necessary, and only if a respirator is necessary, to use that evaluation to choose the appropriate type of respirator.

Enforcement guidance issued contemporaneously with the Standard in 1998 further confirms our reading.  As noted above, the 1998 OSHA Instruction stated, "If the employer has not made any effort to assess the respiratory hazards, and there is *potential* for an overexposure, the [compliance officer] should cite section (d)(1)(iii)." *See* 1998 Instruction, at § VII(E)(2) (emphasis added).  The Instruction also recognized the employer's "continuing" obligation under § 1910.134(d)(1)(iii) to "identify hazards as a result of changes in the workplace" and then provide "[a]ppropriate respirators . . . *as necessary*." *Id.* at § VII(E) (emphasis added).  This flatly contradicts the Commission's reading that § 1910.134(d)(1)(iii) operates only when respirators are already necessary.

## Conclusion

The text, structure, purpose, and regulatory history of the Standard all point in the same direction.  We adopt the Secretary's interpretation of § 1910.134(d)(1)(iii) without resorting to *Auer* deference.  Using "all the 'traditional tools' of construction," we conclude that § 1910.134(d)(1)(iii) is not truly ambiguous. *See Kisor*, 139 S. Ct. at 2415.  We hold that 29 C.F.R. § 1910.134(d)(1)(iii) requires an evaluation of which, if any, respiratory hazards exist in a workplace where there is a potential for overexposure of employees.

We grant the petition and remand for further proceedings consistent with this opinion.

**GRANTED and REMANDED for further proceedings.**